## GILLESPIE VS. PALMER and others.

*Extension of suffrage to colored persons—Ch.* 137, *Laws of* 1849—*Evidence of votes cast at an election—Person taking the oath in sec.* 36, *ch.* 7, *R. S., must be allowed to vote—Liability of inspectors of election.*

1. Sec. 2, of the act of March 22, 1849, submitting to a vote of the people the question of extending the right of suffrage to colored persons, became a law when it had been approved by a majority of the votes cast upon *that subject* at the general election next after the passage of the act.

2. The demurrer in this case admits the allegation that a majority of all the votes cast at said election, upon that subject, was in favor of such extension, but if this had been denied, the fact might have been proved by the best legal proof the nature of the case would admit of, and if proveable in no other way, the court might receive the testimony of living witnesses, such as the inspectors of the election.

3. If a person who tenders his vote to the inspectors, being challenged, takes the oath prescribed in sec. 34 of chap. 7, R. S. 1858, and answers the questions they put to him, no matter how false his answers may be, or how clearly they may shew he has no right to vote, the inspectors must then, if he insists upon voting, tender him the oath prescribed in the 36th section, and, if he takes it, are bound to receive his vote.

4. An action lies against inspectors of an election for unlawfully refusing to receive the vote of an elector, although such refusal was without malice.

APPEAL from the Circuit Court for *Milwaukee* County.

The complaint stated that the plaintiff was a mulatto, of half white and half African blood, a citizen of this state, and a resident for several years last past of the 7th ward of the city of Milwaukee; that at the general election held in said state, in November, 1849, in pursuance of the constitution and of a law passed for that purpose, the question was submitted to the electors of said state, whether the right of suffrage should be extended to persons of African descent residing therein and possessing the necessary qualifications of electors; and that the majority of the votes cast at such election upon that question was in favor of such extension, the number for it having been 5,265, and the number against it, 4,075; but the plaintiff admitted that such majority was not equal to a majority of all the votes cast at such election for the officers voted for at the same. The complaint further alleged the application of the

plaintiff at the proper time to the proper board of registry to have his name registered as an elector of said ward, which was refused, as he believed, for the sole reason that he was a person of mixed or African blood; and that on the day of the general election in November, 1865, while the polls were open in said ward for the reception of votes, he offered his vote to the defendants, who were the inspectors of said election, accompanied by his affidavit in writing giving the reason why his name did not appear on the list of the voters of said ward, and by the affidavit of two householders of said ward that they knew him to be an inhabitant of said ward, stating the place of his residence therein; and that the defendants "wrongfully and illegally refused to receive the plaintiff's vote, or to deposit the same in the ballot box, for the sole reason that he was a person of African descent," to his damage, &c.

A demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action, was sustained *pro forma*; and the plaintiff appealed.

*Byron Paine*, for appellant.

*D. G. Hooker* (with whom was *Geo. B. Smith*), for respondent:

I.   Section 2 of chap. 137, Laws of 1849, was, by the terms of the first section, to become a law only upon condition that "a majority of all the votes cast at such election [in 1849] shall [should] be given in favor of equal suffrage to colored persons." Section 2 never became a law, as it was not approved by a majority of all the votes cast at the election, but only by a majority of all the votes cast on the question submitted.

It may be argued that the word "votes" is used as signifying ballots, and as separate ballots were given on this question, and as the law then in force required separate ballots to be given on other subjects, that a majority of all the voters might have deposited ballots in favor of the proposed law, and still the law might not have been approved by a majority of all the

ballots deposited on all questions voted on at the election; and that in order to render the law consistent in its provisions, and consistent with the provisions of other statutes then in force, it should be changed by judicial construction, so that the words "a majority of all the votes cast at such election," shall read "a majority of all the votes cast at such election *on that subject.*" But the word "votes" is not used in this statute as synonymous with the word "ballots." And although these words are sometimes used one for the other, they are not, strictly speaking, synonymous words. They certainly do not mean the same thing. The word "vote," means suffrage—expression of the will—while the word "ballot" signifies that by which the right of suffrage is exercised; it is the means by which the will is expressed. One elector can exercise the right of suffrage, or vote, but once at a general election, although in doing so he may be allowed to deposit several ballots. The act of depositing one ballot embracing the names of several officers to be voted for, and several subjects to be voted on, is the same as that of depositing at the same time several ballots, embracing, together, the same names and subjects. Each constitutes practically and legally but one act.

The law in force in 1849 regulating elections, required the use of one ballot for state officers, another for county officers, and still another for members of Congress. Sections 5 and 6, page 197, Laws of 1848. And these ballots were required to be deposited in separate boxes. Sections 11 and 14, page 199- 9, Laws of 1848. The number of ballots, therefore, deposited in the several boxes, would not show how many votes had been cast at the election; but the poll lists would show that fact. These lists, and not the ballots, were made the evidence of the whole number of votes cast at the election, and also of the number of ballots deposited in each box. Secs. 15 and 16, p. 199, and sec. 25, p. 200, Laws of 1848. Hence it is clear that the "majority of all the votes cast at such election," refers not to a majority of all the ballots deposited in the sev-

eral boxes, but a majority of all the votes cast at the election, as shown by the poll lists.

II.   The law of 1849 is inoperative and void, because it fails to provide the means by which it could be carried into effect. (1.) It contains no provision, nor was there then in force any provision of law, authorizing or requiring any officer or person to furnish the separate box, in which the ballots on this question were to be deposited.   The inspectors of election were required to provide a "state box," a "county box," a "congress box," and an "electoral box," but none other.  Sec. 11, p. 198, Laws of 1848.   (2.) It contains no provision, nor was there then in force any provision of law, for the canvassing or returning of the votes cast on this question by the inspectors of election.   Secs. 26, 27 and 28, Art. 4, Title 3, and sec. 1, Art. 1, Title 4, Laws of 1848.   (3.) It contains no provision, nor was there any provision of law then in force, requiring the clerks of the several boards of supervisors to embrace in their returns to the governor, secretary of state and treasurer, a statement of the whole number of votes cast at the election, or a statement of the votes so far as they relate to this question. Sec. 8, p. 203, Laws of 1848. (4.) It contains no provision. nor was there in force any provision of law, by which the state canvassers were authorized or required to canvass the votes on this question, nor by which any officer or person was authorized or required to determine or declare the result of the election on this question.   Secs. 13 and 14, pp. 203 and 204, Laws of 1848.   These several provisions were not required except for the purposes of this law.   But as this law could not be carried into effect without them, they should have been embraced in it.

III. If the law of 1849 is so framed, that in order to render it consistent in its provisions, and with other provisions of statute then in force, it must be so construed that the majority of votes referred to should be deemed a majority of the votes cast *on that subject,* then the law is clearly void, because it

would be in direct conflict with sec. 1, Art. 3 of the constitution of the state. This section provides that "no such law shall be in force until the same shall have been submitted to a vote of the people at a general election, and approved by a mrjority of all the votes cast at such election." There appears to be no special reason why this language of the constitution should not be construed by the usual rule of construction, which is, that "all words and phrases shall be construed and understood according to the common and approved usage of the language." Sec. 1, chap. 5, R. S. But if the language used does not clearly indicate the intention of the convention that framed the constitution, and if it is necessary to go back of or look outside of the language itself to ascertain that intention, then I insist that *the language used in the constitution in submitting other questions to a vote of the people, the requirements of other provisions of the constitution, the circumstances under which this provision was adopted by the convention, the action of the convention on the bank question, and the construction which the state canvassers, the legislature, and the people have given to this particular provision,* clearly show that the "majority of all the votes cast at such election," means a number of votes equal to a majority of all the persons voting at the election. 1. Sec. 5, Art. 11, of the constitution, in providing for submitting to a vote of the people, the question of "bank or no bank," declares that "if at any such election, a number of votes equal to a majority of all the votes cast at such election *on that subject* shall be in favor of banks, then the legislature shall have the power to grant bank charters," &c. Sec. 1, Art. 12, in providing for submitting to a vote of the people proposed amendments to the constitution, declares that "if the people shall approve and ratify such amendment or amendments by a majority of the electors *voting thereon,* such amendment or amendments shall become part of the constitution." Sec. 2, Art. 12, in providing for the calling of a convention to revise or change the constitution, declares that "if it shall appear that a majority of the

electors *voting thereon* have voted for a convention, the legislature shall, at its next session, provide for calling such convention." Sec. 7, Art. 13, in providing for submitting to the people the question of dividing counties, declares that the county shall not be divided "unless a majority of all the legal voters of the county *voting on the question* shall vote for the same." And sec. 8, Art. 13, in providing for the removal of county seats, declares that no county seat shall be removed until "a majority of the voters of the county *voting on the question* shall have voted in favor of its removal." These provisions and the one for the extension of suffrage are the only ones in the constitution for the submission of questions to a vote of the people. One provides that the question submitted, in order to become a law, shall be approved by a *majority of all the votes cast at such election;* while each of the other five limits the requisite number, in the most guarded language, to a majority of the votes cast on the *question submitted.* If it had been the intention to limit the requisite number of votes in the provision for the extension of suffrage, to a majority of the votes cast *on that subject*—a subject in which the people of the state were as deeply interested, and on which the members of the convention exhibited quite as much feeling, as upon any of the other subjects alluded to—I submit that the limitation would have been actually made, as in the other provisions. 2. This provision for the extension of suffrage practically operates as a provision for an amendment to the constitution. Sec. 1, Art. 12, on amendments, requires that a proposed amendment shall be agreed to by a majority of all the members elected to each of the two houses of the legislature, and then referred to the legislature to be chosen at the next general election, and approved by a majority of all the members elected to each house of such legislature, before it can be submitted to the people. And as an ordinary amendment to the constitution can not be made, without being twice approved by a majority of all the representatives of the people, and also by a majority

of all the people who may be disposed to vote on the question, it is not reasonable to presume, against the language used, that the convention intended to permit a change in the provisions of the constitution on so important a subject as the right of suffrage, and one which the convention knew would at that time have been particularly odious to a large majority of the people, without requiring that it should be approved, either by an actual majority of all the members of the legislature, or by an actual majority of the voters themselves.   3. The proposition to extend the right of suffrage to colored persons had been submitted to the people, and rejected by them in 1847.   The number of votes cast in favor of the proposition, was 7,664 ; the number against it, was 14,615 ; while the whole number of votes for and against the proposed constitution, submitted at the same time, was 34,351 ; showing that 12,072 electors voted on the question of the adoption of the constitution, who did not vote either for or against the extension of suffrage.   The convention, in acting upon the proposition to submit the question again, had in view the result of the former submission, and acted specially in reference to it.   It was perfectly apparent that there would be a material difference between a majority of the votes cast at the election, and a majority of the votes on *that subject.*   4. The second section of the article on " banks and banking," as originally adopted, empowered the legislature to submit to the people at a general election, the question of " bank or no bank," and provided that if " a number of votes equal to a majority of all the votes cast at such election," should be in favor of banks, then the legislature should have power to grant bank charters, or to pass a general banking law.   And it further provided that the law, when so passed, should have no force or effect, until it should be submitted to a vote of the people, and be approved by "a majority of all the votes cast at such election."   Jour. and Debates Convention, 1847 and 1848, p. 317.   The article was recommitted with instructions to the committee to amend that section, by

limiting the requisite number of votes in each provision to a majority of the votes cast on the question submitted. Ibid., p. 330. These amendments were adopted, and the article was passed as amended. This section, as originally drawn and adopted, was opposed upon the special ground that it required a majority of all the votes cast at the election to enable the legislature to pass the law, and also required a majority of all the votes cast at the election to give the law effect. It was claimed that a majority of all the votes cast *on that subject* was all that could be reasonably required, either to authorize legislative action or to give the law effect. See page 317. The only object in recommitting the article was to change that majority ; and the only objection to recommitting it, or to adopting the amendments reported, was that a majority of all the votes cast at the election should be required. See pp. 330 & 340. And the only question discussed was, whether a majority of all the votes cast at the election, or a majority of all the votes on that subject, should be required. The convention, therefore, understood the meaning of the language used in the several provisions for submitting questions to a vote of the people ; and it is reasonable to suppose that it was actually intended, by the language used in the provision for the extension of suffrage, to require a majority of votes equal to a majority of the electors voting. I hardly think the court will *presume* a different intention.

5. If the state canvassers were authorized by law to determine whether the law of 1849 had receive the requisite number of votes, and to declare whether it had been approved or not, then their decision was final, and is binding upon this court. *Havemeyer v. The Board of Supervisors of the County of Iowa*, decided at present term U. S. Supreme Court. And it is immaterial, for the purposes of this proposition, whether they were so authorized or not, because the plaintiff is not in a position to gainsay their authority. This suit is brought upon the theory, and can be maintained only upon the theory, that

they were endowed by law with the authority which they assumed to exercise.    The legislature had several times construed this language of the constitution as requiring a majority of votes equal to a majority of all the electors voting : once in adopting the revised statutes of 1858, and not embracing the law of 1849 in the revision, as one of the laws of the state ; again in 1857, and again in 1865, in passing a law to submit the question to the people anew ; and if there is any real doubt as to the meaning of the language under consideration, then this legislative construction is certainly entitled to much weight.    Sedgwick on Stat. and Const. Law, 252 ; *Coutant v. The People*, 11 Wend., 511.    And as the questions involved in this case, and the object sought by the suit, are wholly political in their nature, the construction given by the legislature should be deemed conclusive, and particularly so, as the people of the state have uniformly acquiesced in and approved of this legislative construction.

DOWNER, J.    Section 1, Art. 3 of the constitution of this state, provides that white male persons, over the age of twenty-one years, who have resided in this state one year next preceding any election, and who are citizens of the United States or have declared their intentions to become citizens, and also certain persons of Indian blood, shall be deemed qualified electors at such election.    Then follows a proviso in the following words : " Provided, that the legislature may at any time extend by law the right of suffrage to persons not herein enumerated ; but no such law shall be in force until the same shall have been submitted to a vote of the people, at a general election, and approved by a majority of all the votes cast at such election."

The first question for our consideration is, what is the meaning of the words in this proviso, " *approved by a majority of all the votes cast at such election ?*"    Three different constructions of this clause were suggested on the argument :

1st. That it required that the extension of suffrage should be approved by a majority of all the votes, *on all subjects and for all officers*, cast at such election.

2d. That it should be approved by a majority of all the voters voting at such election.

3d. That it should be approved by a majority of all the votes *on that subject* cast at such election.

Is the first construction correct ? What is the meaning of the word " vote" ? It is the expression of the choice of the voter for or against any measure, any law, or the election of any person to office. At a general election there are several officers, both state and county, to be elected, and there may be measures to be voted on. The expression of the choice of the voter in favor of any candidate for office by depositing a ballot for him, is a vote for such candidate ; and if there are several candidates for different offices, and the voter votes for each, he casts in so doing as many different votes as there are candidates for whom he votes ; and it makes no difference that they are all on one piece of paper or ticket. The same voter, at an election where the extension of the right of suffrage was voted on, might cast one vote in favor of that measure, and if there were ten candidates for as many different offices, state and county, voted for at such election, as there frequently are, cast a vote for each of such candidates. If the first construction, requiring a majority of all the votes on all subjects and for all offices, cast at such election, in favor of the extension of suffrage, before it can be adopted, is the true construction, then the same voter might cast one vote in favor of the extension, and in voting for the candidates for the different offices cast ten votes which would be counted against the very measure he voted for. This absurdity involved in the first construction is conclusive against it.

To adopt the second construction would be to say that the word " votes," in the clause in question, meant the same as the word " voters." These are two words which mean very differ-

ent things—are never used as synonymous, even in the loosest common conversation. But although these words are not synonymous, yet by a figure of speech the thing done is sometimes put for the doer. This is however seldom or never done in such instruments as state constitutions, which are formed with deliberation and care, and in which language is used literally and with great precision. If, however, we should concede that the clause in question could be construed to mean, or was equivalent to "approved by a majority of all the voters voting at such election," it would not follow that it had reference to a majority of voters voting on any other measure than the one mentioned in the proviso ; or that the number of votes cast at such election for the candidates for any office should determine whether the suffrage was extended or not.

Why should such a test be required on this question? Ordinarily at a general state election the candidates for governor receive as many votes as those for any other office ; and if the construction contended for should prevail, the extension of suffrage, to be carried, must receive—not a majority of votes cast on that subject, but the number of votes cast for it must at least be equal to a majority of the votes cast for all the candidates for governor at such election. It must be even more : it must be equal to a majority of all the voters voting at the election for any and all candidates, not only for the same office, but for different offices and for different measures. The candidates for governor at such election may not receive the votes of all the voters voting at such election, though they may receive more than the candidates for any other office. For there may be voters who, from want of confidence, or private pique or ill will, will not vote for any of the candidates for governor, who will vote for the candidates for other offices ; and there may be those who, for the same reasons, would not vote for the candidates for secretary of state, who would vote for the candidates for governor, state treasurer and other offices ; and the same may be true in relation to the votes given

for the candidates for the respective offices; so that all the candidates for any one office may not receive the votes of all the voters voting at such election by several hundreds and perhaps thousands. And yet the construction contended for requires that the extension of suffrage, to be carried, should receive a majority of the votes of all the voters voting at such election for any and all candidates—should receive more votes than is required to elect a governor or any other officer, or to carry any other measure. Is it reasonable to suppose that this was the intention of the convention? Under the provisions of our constitution, as well as of other constitutions, persons are elected to a particular office who have a majority of the votes cast—not for the candidates for some other office, but for the candidates for *that* office. Measures or laws are also declared adopted or rejected according as they receive or fail to receive each a majority of the votes cast for or against it. To declare a measure or law adopted or defeated—not by the number of votes cast directly for or against it, but by the number cast for and against some other measure, or for the candidates for some office or offices not connected with the measure itself, would not only be out of the ordinary course of legislation, but, so far as we know, a thing unknown in the history of constitutional law. It would be saying that the vote of every person who voted for any candidate for any office at such election, and did not vote on the suffrage question, should be a vote against the extension of suffrage. If this construction is correct, there would be no necessity of providing by law, as the legislature did, when the question was submitted to a vote of the people, for the casting or recording of any votes directly against the extension of suffrage; for if the votes in its favor are not equal to a majority of all the voters voting for any and all of the candidates voted for at such election, the second section would not become a law. So to construe the clause of the constitution would make it a very extraordinary provision, and it appears to us that the construction we are asked by the counsel

for the respondents to give it, is forced and unnatural, and should not be given if any other can reasonably be given to the clause. It is more in accordance with the general principles of legislation upon such subjects, and more reasonable, to construe the clause as a provision for the extension of suffrage in case a majority of all the votes *on that subject* cast at any general election should be in its favor. We do not see how any other construction can reasonably be given to the clause. The words added by this construction are words which, whenever the same or similar language is used in reference to a vote on any measure or for any office, are generally understood.

According to section 1, article XII of the constitution, the legislature may propose amendments to it, and if they are approved by "*a majority of the voters voting thereon,*" at the time prescribed by the legislature, the amendments become part of the constitution. The right of suffrage by such amendment could be given to colored persons. Is it probable that the framers of our constitution required more votes to extend the right of suffrage in one way than in another? More votes to approve an act of the legislature conferring the right when so approved, than to make and approve any and all amendments of the constitution, including that conferring suffrage on colored persons? We see no reason for such a conclusion. Nor do we think much weight should be attached to the action of the board of canvassers in 1849, construing the clause under consideration. The secretary of state and the then clerk of the supreme court canvassed the votes at that time and declared the result. It does not appear that the highest law officer of the state, the attorney general, expressed any opinion, or was consulted on the subject.

The next question is, did the act authorizing the extension of suffrage to be submitted to a vote of the people contain the necessary provisions or machinery to carry it into execution? It is said that no provision is made for canvassing the votes on this measure cast at the respective polls, and no provision for

any returns to the secretary of state, or that the state canvassers shall canvass the votes.    The act submitting the extension of suffrage to a vote of the people (sec. 1, chap. 137, Laws of 1849,) provides, *inter alia*, for a separate ballot in a separate box at each poll ; and also, " if at the said election a majority of all the votes cast at such election shall be given in favor of equal suffrage to colored persons, then said section two of this bill shall be a law." Section two conferred the right of suffrage on male colored inhabitants over twenty-one years of age. The complaint avers that a majority of all the votes cast at that election upon the question whether the said right should be so extended, was in favor of such extension.    The demurrer admits the truth of the complaint.

As a matter of history we know that the returns of votes on this subject were made to the secretary of state, and canvassed by the state canvassers.    We will not now stop to enquire whether the general laws then in force did or did not authorize their action.    For if an issue were joined denying the allegations of the complaint, we are of opinion they could be proved, so far as they relate to the number of votes cast on the suffrage question, by the best legal proof the nature of the case would admit of; and if the number could be proved in no other way, the court might receive the testimony of living witnesses, such as the inspectors, as to the number of votes cast at each poll.

It is contended by the respondents that the complaint is defective because it does not aver *malice* on their part in rejecting the vote. Chapter 7, R. S., prescribes the duties of the respondents as inspectors, and they are, in substance, that it shall be the duty of each inspector to challenge every person offering to vote, whom he shall know or suspect not to be duly qualified as an elector.    One of the inspectors may then administer to the person offering to vote an oath that he will truly answer such questions as shall be put to him touching his residence and qualifications as an elector.    If the person refuse to

take the oath, or to answer any of the questions put to him, his vote is to be rejected; but if he take the oath and answer the questions, however false may be his answers, and however clearly they may show that he has no right to vote, and he still insists upon voting, it is their duty to tender to him the oath prescribed in section thirty-six of the act; and if he takes it, to receive his vote. If he swears falsely, or votes without the requisite qualifications, he may be, on conviction, punished. But if he takes the oaths and answers the questions put, there is no discretion with the inspectors. They are mere ministerial officers; certainly far from being judicial. The registry act provides in substance that any one may have his name registered as a voter upon taking the same oaths and giving the same information required for voting. If the inspectors are mere ministerial officers, then we see no good reason why the general principle of law, that a ministerial officer is liable for a wrong done by him acting in his official character, though without malice, should not be applied. It is held otherwise, however, in England, in New York and some other states. The reason of these decisions appears to be, that the inspectors of elections are entrusted with a *discretionary* authority, and are *quasi* judicial officers. In Massachusetts and Ohio it is held the action will lie without malice. *Lincoln v. Hapgood*, 11 Mass., 350; 5 Met., 298; 4 Gray, 433; *Jeffries v. Ankeny*, 11 Ohio, 373; 9 Ohio St., 568. Some of these decisions are based partly on the state statute law regulating elections, as being different from the English law, but mainly upon the necessity of protecting the highly valued privilege of voting when the law has provided no other remedy. We adopt the rule of these decisions.

It follows that the order of the county court was erroneous.

DIXON, C. J. I fully agree with Mr. Justice DOWNER in the construction to be given to the proviso found in subdivision 4, section 1, article III of the constitution. Without the

determination of the board of canvassers in 1849, and the consequent action of the legislature and people since that time, all of which may be said to have taken place without serious thought and deliberation, and certainly without debate upon the true meaning of this proviso, I do not see how its language could ever have been the subject of doubt or controversy.   To me, to whom the question was new when this case was presented, it has seemed from the very first that the meaning was, a majority of all the votes cast *upon the subject.*   The very able arguments of counsel upon both sides, and subsequent reflection, have only tended to confirm this my first impression, derived from the language of the proviso itself.   It is obvious from the very reading that three and but three principles or leading ideas were present to the minds of the framers or persons who prepared the proviso : first, that the right of suffrage should not be extended to persons not already enumerated in the section, without the assent of the legislature, to be evidenced by a law enacted for that purpose ; second, that such law should not be in force until submitted to a vote of the people and approved by a majority of all the votes cast ; and third, that such submission to a vote of the people and majority of all the votes cast should be at some general election. According to the language employed, all the safeguards intended by the framers to be thrown around this important subject of the extension of suffrage are obviously embraced in these three principles.   Any other construction, it seems to me, would be a plain violation of the language, and, where that is clear, as I think it is here, it must govern, and there is really no room for construction, except to apply the maxim that "general words shall be aptly restrained according to the subject matter or person to which they relate."   This maxim is of very great weight in all cases where the words used are general, or not expressly applied in the text to the subject matter or person under consideration.   It applies with peculiar force to the words in this proviso, "votes cast," which are general,

and limits them to votes cast upon the subject which the framers had in mind, namely, the extension of suffrage.

The only words which can, as it seems to me, possibly lead one to any different conclusion, are the words "at such election," found at the end of the clause. With those words omitted, it seems to me that no one could hesitate, but that all must assent to the correctness of our views. I have already said that one of the principles manifested by the provision was, that the question should only be submitted and the votes taken at some general election. The object of this is very clear. At such an election the voters are more generally at the polls. Other questions are to be acted upon, and measures adopted or rejected, in which all or a greater number of the electors feel an interest. At such an election a more full and fair expression of popular opinion would be obtained upon the question of the extension of suffrage. On the other hand, if the question were to be submitted at a special election ordered for that purpose, only those feeling an especial interest in it would attend, and the measure might be carried or defeated by a majority of the votes cast, whilst if it had been at a general election, with all or nearly all the qualified voters present at the polls with an opportunity to vote upon it, there might have been a very decided expression of public opinion the other way. Such was the advantage to be gained by a submission "at a general election," and so prominent was the idea in the minds of the framers, that it is repeated at the end of the clause after the words "votes cast." The words "at such election" were inserted, as it were, *ex industria*, the more carefully and thoroughly to exclude the idea that a majority of votes cast at any other than a general election should suffice. Such repetitions are not unfrequent in legislative enactments, and are sometimes found in written constitutions. To say "a majority of all the votes cast at such election" is no more than if the framers had said "a majority of all the votes cast at a general election," thus repeating the exact words previously used. In

either case the sense would have been the same if the last words had been omitted, but the repetition expresses or seems to express the intention of the framers with greater certainty and precision. But in neither case, in my judgment, does the addition afford the slightest ground for saying that the framers intended that votes cast at the same election upon other subjects should be counted either for or against the law for extending the right of suffrage. Such a provision in the constitution of a state would be an anomaly in our system of government. It would be contrary to the fundamental American idea, which is that in all popular elections the will of the majority of the voters voting upon any subject or question submitted shall prevail. It must be supposed that the convention acted upon this idea in forming and submitting, and the people in ratifying the constitution, and its language must be interpreted in conformity to it, unless a contrary intention is clearly expressed. If we look to other similar provisions of the constitution, and especially those which elicited debate and a careful examination of the language employed, we find this idea strictly adhered to. This is strikingly exemplified in the section which provides for submitting to the voters the question of "bank or no bank." The same is also true of the provisions for submitting amendments to the constitution, for calling a convention to revise or change it, and some others. All these provisions, instead of showing or tending to show, as was contended, that an actual voting majority was not to govern upon the question of the extension of suffrage, seem to me to tend very strongly and almost irresistibly the other way. They fix the principle upon which the convention acted and intended to act in all such cases.

Upon the question whether the word "votes" can be construed to mean "voters," I deem it unnecessary to add anything to what is said by Mr. Justice DOWNER. I agree with him upon that, as also upon the other points discussed in his opinion.

COLE, J.   I have not deemed it necessary to write out my views upon the legal questions involved in this case, and shall content myself with saying that I fully concur in the opinions delivered by the Chief Justice and Mr. Justice DOWNER.

*By the Court.*—The order of the county court sustaining the demurrer to the complaint is reversed.