JOHN H. CASHMAN *vs.* CITY CLERK OF SALEM.

Essex.    November 22, 1912. — November 26, 1912.

Present: RUGG, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Elections.   Statute.   Salem.   Words,* "Ballots," "Votes."

St. 1912, c. 559, Part III, § 1, provided that the registered voters of the city of Salem at the State election in the year 1912 should "vote primarily on the following question: 'Shall the present charter of the city of Salem be repealed?' and secondarily on the following question: If the present charter of the city of Salem is repealed, shall the new charter of the city be: 'Plan 1, . . . ' or 'Plan 2 . . . ?'" and then continued as follows: "If on a majority of the ballots cast at said election, the votes shall be for a repeal of the present charter of the city of Salem, the plan receiving the larger number of votes on the secondary question shall be adopted as the charter for the city." The official ballot which contained these questions contained also the names of a large number of candidates for State and national offices and several other questions, including two upon the adoption of amendments to the Constitution. A majority of the votes upon the question of repealing the charter of the city of Salem were for such repeal, but a majority of all the official ballots lawfully deposited in the ballot boxes at that election by the registered voters of the city of Salem were not cast in favor of such repeal, a large number of such ballots having been left blank upon

that question. *Held*, that the "majority of the ballots cast at said election," required by the statute for the repeal of the charter, was a majority of the votes cast upon that question, and that the charter was repealed.

PETITION, filed on November 15, 1912, by a citizen of Salem for a writ of mandamus addressed to the city clerk of that city commanding him to accept and file a nomination paper nominating the petitioner for the office of alderman in accordance with the provisions of the charter of the city of Salem, St. 1836, c. 42.

The answer of the respondent alleged that the former charter of Salem had been repealed by vote of the citizens at the State election held on November 5, 1912, in accordance with St. 1912, c. 559, Part III, § 1, and that the respondent had refused to accept the nomination paper of the petitioner because under the new charter there was no such office as alderman.

At the request of the parties the case was reserved by *Morton*, J., upon the petition and answer and an agreed statement of facts for determination by the full court.

The case was submitted on briefs.

*W. H. McSweeney, M. J. McSweeney & F. H. Caskin, Jr.*, for the petitioner.

*M. L. Sullivan & J. J. Ronan*, for the respondent.

*A. P. White, A. W. Putnam & R. W. Hill*, for the Salem Charter Association.

RUGG, C. J. Whether the city charter of Salem should be repealed was submitted to the voters of that city on the fifth of the present month, under the provisions of St. 1912, c. 559, Part III, § 1. Its material language is: "This act shall be submitted to the registered voters of the city of Salem at the State election in the year nineteen hundred and twelve, and the city clerk shall, not less than two weeks before said election, transmit . . . to every qualified voter in said city a copy of this act. At the said election the voters shall vote primarily on the following question: 'Shall the present charter of the city of Salem be repealed?' and secondarily on the following question: If the present charter of the city of Salem is repealed, shall the new charter of the city be: 'Plan 1, . . .' or 'Plan 2 . . . ?' If on a majority of the ballots cast at said election, the votes shall be for a repeal of the present charter of the city of Salem, the plan receiving the larger number of votes on the secondary question shall be adopted

as the charter for the city." The ballot on which these questions were printed contained also the names of a large number of candidates for State and national offices, and several other questions including two questions upon the adoption of amendments to the Constitution. The total number of ballots cast at that election was 6,966, of which on the question of repealing the charter 1,676 were blank, 2,240 were against, and 3,050 were for, repeal. The point to be decided is whether the charter was repealed.

A technical construction of the words used might lead to the conclusion that "ballots" refers to the official ballots furnished by public authority, containing the names of all candidates to be voted for and all questions submitted to popular vote, and that the repeal is to be effected only by a vote therefor appearing upon a majority of all the official ballots which are deposited lawfully in the ballot boxes. Argument in support of this view may be drawn from the phraseology of other acts of the Legislature of 1912 requiring submission to popular vote on the same general ballot and acceptance by "a majority of the voters voting thereon," or "persons voting thereon." Sts. 1912, c. 503, § 2; c. 587, § 1. Resolves, cc. 21, 115.

But broader and sounder considerations lead to the conclusion that the statute means that only the ballots on which were votes touching the particular question were to be counted in determining whether there has been a repeal. It is a fundamental principle of our system of representative government that the will of the majority expressed according to law must prevail. But the majority of those who actively participate in the affairs of state and not of the entire body of voters, controls. Elections must be settled as a practical matter by those manifesting interest enough to vote. Failure on the part of some of the electorate to take the trouble to express their views by depositing their ballots cannot stop the machinery of government. Apathy is not the equivalent of open opposition. It is the nature of our institutions that the majority of those who vote must accomplish the avowed purpose of all elections, which is the choice among candidates or the approval of policies. This principle is expressed in the provisions of our Constitution to the effect that in elections of civil officers those having a plurality of the votes cast shall be elected, and that amendments of the Constitution shall

be adopted by the majority of those voting thereon. Those who come to an election and cast a blank ballot in principle are no more efficacious in expressing their convictions than those who absent themselves altogether. Both classes must be presumed to be willing to abide by the decision made by the majority of those voting, unless there is an express provision of law to the contrary. *First Parish in Sudbury* v. *Stearns*, 21 Pick. 148. *Carroll County* v. *Smith*, 111 U. S. 556, 563.

It has been the unvarying policy of the Legislature to make the acceptance of a city charter turn upon the affirmative votes of a majority of those voting on the question. See statutes collected in *Wheelock* v. *Lowell*, 196 Mass. 220, 226, and for those enacted since that opinion see Sts. 1911, c. 531, § 79 (Cambridge); c. 680, Part III, § 1 (Chelsea); c. 645, § 67 (Lowell); 1910, c. 542, § 48 (Beverly); c. 602, Part III, § 1 (Lynn); 1909, c. 486, § 35 (Boston); c. 448, § 24 (Taunton); 1908, c. 611, § 31 (Gloucester); c. 574, § 46 (Haverhill); c. 559, § 12 (Chelsea).

The language of all these statutes (numbering nearly one hundred), with two or three exceptions where a popular vote was not required, is unmistakable to the effect that acceptance rests upon the affirmative votes of a majority of those voting on the question. The form of words used has not been the same, but the purpose has been clear. It is only within a brief period that there has been submitted not only the question whether an old charter shall be repealed but also, if it is repealed, which of two radically different forms of municipal government shall be adopted. This complexity has given rise to the use of language in two other instances like that in the case at bar, where the vote was to be had at a general election. Sts. 1911, c. 621, Part III, § 1 (Lawrence); c. 732, Part IV, § 1 (Pittsfield). The framing of questions under such circumstances, so that their terms may be too plain for argument, while simple, is not instantly obvious. No reason is apparent why a rule for the acceptance of these particular charters by the voters of Lawrence, Pittsfield and Salem should be adopted by the Legislature essentially different from that followed in the large number of other city charters enacted from time to time for these and other municipalities. In view of this long established legislative practice, illustrated by so many instances, it would require clear and unequivocal language to indicate a

change of legislative purpose. If such a departure had been deliberately intended, it would have been easy to express it so that it would have been free from doubt. To have said that the old charter should be repealed only by affirmative votes appearing upon a majority of all official ballots, including blanks, legally deposited in the ballot boxes for any purpose, would not have been open to uncertainty. A continued legislative intent in this regard is more natural than a violent departure from a custom.

As a construction can be given readily to the language now to be interpreted in harmony with this legislative practice, it is probable that this meaning was intended. There is no logical connection between the votes for other questions or other candidates and the charter question. They are separate and distinct. No· ground in principle appears why every other proposition submitted to the people should be adopted by a majority of those voting on it and this one require the approval of a majority of all who cast ballots for any object.

A close analysis of the decisive words of the statute demonstrates that they are reasonably susceptible of a meaning consistent with the broader considerations which have been adverted to. The word "election" is used in two different senses in the portion of the statute which has been quoted. In its first two uses it refers to the general State election for the purpose of fixing the time and places at which the voting on this question shall be had. In its third use, namely, "At the said election the voters shall vote primarily on the following question," it must refer to the vote upon the question itself. The Legislature hardly would say to the voters of Salem, at a State and national election, where many candidates, respecting whose election public feeling might be intense and widespread, were submitted to the suffrage and two questions of the magnitude of constitutional amendments were to be answered, that their first or chief duty related to the repeal of their city charter and their next obligation was to consider which of two forms should be substituted for it. In its fourth use, in the final sentence quoted from the statute, it may refer to the question itself as readily as to the general election. "Ballot" and "vote," though in some connections of different meaning, are shown by the dictionaries as well as by common observation to be used occasionally as synonyms. It is to be noted that the

words "official ballots," which are defined by St. 1907, c. 560, § 1, are not employed, but simply "ballots." "Ballots" and "votes" appear to be used here as having the same significance, and not for the purpose of expressing the sharp distinction which would have arisen if the official ballot as a whole had been referred to expressly. It is provided in the election law (St. 1907, c. 560, § 271) that if the choice of a voter cannot be determined touching any candidate, his ballot shall not be counted. It would require exceptionally plain language in a special law to override this general rule and give the force of a negative vote to a blank.

The language of St. 1911, c. 732, revising the charter of the city of Pittsfield, strongly and perhaps decisively confirms the view that the Legislature, even though choosing different language, did not intend to change its policy. In Part IV, § 1, of that act, which provides for submitting to popular vote at the State election questions as to which of several plans should be adopted, the words "If on a majority of the votes cast at said election" are used as meaning the same as the words "If on said question a majority of the voters voting thereon." This is in substance a declaration by the Legislature that it uses the two phrases as synonymous. If that is the meaning of substantially the same words in one statute, it is forcibly persuasive of their meaning in another similar statute.

There are many conflicting decisions in other jurisdictions upon somewhat similar questions. Most of them are collected and discussed in 1 Dillon, Mun. Corp. (5th ed.) 383; 15 Cyc. 390. It is not necessary to review them in detail. The leading ones in consonance with this opinion are in the footnote.*

---

* *County of Cass* v. *Johnston*, 95 U. S. 360.   *Gillespie* v. *Palmer*, 20 Wis. 544.   *Walker* v. *Oswald*, 68 Md. 146.   *Bott* v. *Secretary of State*, 33 Vroom, 107.   *Commissioners of Marion County* v. *Winkley*, 29 Kans. 36.   *State* v. *Echols*, 41 Kans. 1.   *Smith* v. *Proctor*, 130 N. Y. 319.   *State* v. *Blaisdell*, 18 No. Dak. 31, 39.   *Fox* v. *Seattle*, 43 Wash. 74.   *State* v. *Grace*, 20 Ore. 154. *Davis* v. *Brown*, 46 W. Va. 716.   *Board of Education* v. *Winchester*, 120 Ky. 591.   *Montgomery County Fiscal Court* v. *Trimble*, 104 Ky. 629.   *Tinkel* v. *Griffin*, 26 Mont. 426.   *Howland* v. *Board of Supervisors*, 109 Cal. 152. *Strain* v. *Young*, 25 Wash. 578.   *State* v. *Langlie*, 5 No. Dak. 594.   *Contra*, in addition to cases cited in Dillon and Cyc., *People* v. *Weber*, 222 Ill. 180, 186, *Joe* v. *State*, 136 Ga. 158.

This judgment rests, however, not upon authority but upon the reasoning stated.

The conclusion follows that the majority of the votes cast upon the charter question being in favor of its repeal, that result was accomplished and Plan 2 of the statute (St. 1912, c. 559, Part II) was adopted as the new charter.

*Petition dismissed without costs.*