## Harness Racing Referendum

HERBERT N. SHENKIN, Deputy Attorney General, and ANNE X. ALPERN, Attorney General, December 29, 1959.—You have requested this department to interpret the following language in the recently enacted harness racing legislation (act no. 728, 1959 session, signed by the Governor on December 22, 1959):

"Section 20, Local Option (a). The commission shall not consider an application for a license to conduct harness race meetings *until a majority of the electorate*

*of the county in which the racing plant is located shall have voted in favor of locating a racing plant within the county at an election held on that question. . . ."* (Italics supplied.)

The specific question has been raised: Does the above language require a majority of the eligible or registered voters in the county to approve harness racing, or is the statute satisfied if a majority of the votes cast at such an election favor harness racing?

Preliminarily, it should be noted that the use of the term "electorate" in section 20 must be interpreted to mean "registered voters." See Aukamp v. Diehm, 336 Pa. 118 (1939).

It is clearly established in most States of this country that, unless there is a clear statutory provision to the contrary, in elections where there are an indefinite number of voters, those who absent themselves from the election are considered as acquiescing in the result declared by a majority of those actually voting. This principle is inherent in our representative form of government and is necessary to the practical working of the elective system. See 1 Dillon, Municipal Corporations (5th Ed.) §383, p. 653; Virginian Railway Co. v. System Federation No. 40, 300 U. S. 515, 559, 560 (1937) ; 131 A. L. R. 1382, and cases there cited.

Pennsylvania is in accord with the overwhelming majority view on this subject. In Munce v. O'Hara, 340 Pa. 209 (1940), the Supreme Court had before it for interpretation section 4(g) of the Act of April 18, 1929, P. L. 549, which provided that:

"Any county, city, borough or township may, *by a majority vote of its qualified electors, cast at any general election* . . . direct the discontinuance of the use of voting machines at elections held in such county, city, borough or township. . . ." (Italics supplied.)

The Supreme Court was strongly urged to adopt the view that this language meant a majority of the elig-

ible voters in such an election. It refused to do so, stating:

"No method having as yet been devised whereby to compel a complete vote by all the voters, the practical working of the elective system necessarily requires that those who abstain from voting be considered as acquiescing in the result declared by a majority of those who exercise the suffrage. As stated in Cashman v. Entwistle, 213 Mass. 153, 100 N. E. 58: 'It is a fundamental principle of our system of representative government that the will of the majority expressed according to law must prevail. But the majority of those who actively participate in the affairs of state and not of the entire body of voters, controls. Elections must be settled as a practical matter by those manifesting interest enough to vote. Failure on the part of some of the electorate to take the trouble to express their views by depositing their ballots cannot stop the machinery of government. Apathy is not the equivalent of open opposition. It is in the nature of our institutions that the majority of those who vote must accomplish the avowed purpose of all elections, which is the choice among candidates or the approval of policies' ": Munce v. O'Hara, supra, p. 210.

There is almost no dissent from the above principles. However, some jurisdictions adopt the view that the majority of votes cast must be determined on the basis of the highest number of votes cast at the election and not merely on the number of votes cast on the particular question. Pennsylvania, and most other States, refuses to adopt this view, and holds that the majority question must be determined on the basis of the number of votes cast on the particular issue under consideration. In the Munce case itself there were 83,-368 qualified voters in Washington County, the county involved. The greatest number of votes cast in the election was 51,782 for Governor. On the question of the

discontinuance of voting machines, 18,730 voted for the discontinuance and 13,805 voted for the continuance. The court stated:

"And, according to what we regard as the better view, where, as here, a proposition to which such a statutory provision relates is to be submitted at a general election, the submission of the question is to be regarded as a special election for that purpose, and the votes cast thereon are to be considered separately and apart from any votes cast for candidates for office, or upon other questions . . .": Munce v. O'Hara, supra, p. 212.

The language used in act no. 278 is substantially similar to that used in other statutes that have come before the courts, viz., "a majority of the voters", "a majority of the legal voters", "a majority of the qualified voters", "a majority of the electors". See 1 Dillon, Municipal Corporations (5th Ed.), §383, p. 654; 131 A. L. R. 1392, et seq.

If the Legislature of Pennsylvania had intended to require over 50 percent of the registered voters to vote in favor of harness racing in order to authorize it in a particular county, it could have said so in language clear and unambiguous. It has not done this. The language used by the legislature has been construed by the courts in similar situations to mean a majority of those voting on the subject.

The principles of law set forth above are particularly applicable to the present question, involving as it does a submission of the harness racing question at a primary election: Act no. 728, sec. 20(b). It is a well known fact of political life that far less than 50 percent of the registered voters cast ballots at a primary election. This was clearly demonstrated in the last three primary elections. In the 1954 primary only 25 percent of the registered voters in Philadelphia County voted, only 36 percent in Allegheny County, 34

percent in Lackawanna County, and 40 percent in Dauphin County. In the 1956 primary the percentages were about the same: 38 percent in Philadelphia County, 35 percent in Allegheny County, 31 percent in Lackawanna County, and 42 percent in Dauphin County. The 1958 primary was no different; 32 percent in Philadelphia County, 43 percent in Allegheny County, 34 percent in Lackawanna County, and 49 percent in Dauphin County.

It cannot be assumed that the legislature intended a vain thing. It must be taken for granted that the legislature was aware of the general apathy exhibited by voters at primary elections. To interpret the language in the harness racing act, "majority of the electorate", to mean a majority of the registered and eligible voters would impute to the legislature an absurd thing, for such a majority of the voters never even cast ballots in primary elections. Section 52 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §552, prohibits such an interpretation. This section provides that the legislature does not intend a result that is absurd, impossible of execution or unreasonable, and that the legislature does intend the entire statute to be effective and certain.

It would be unfair to those who are opposed to harness racing to lull them into the belief that a majority of all the registered voters in any county is necessary to authorize harness racing, and that harness racing could be defeated by sitting back and not voting. As indicated above, the issue must be determined on the basis of the majority of votes cast on the harness racing question in the particular county, and the registered voters in the county who do not participate in such an election must be presumed to acquiesce in the result reached by a majority of the voters who cast ballots.

It is our opinion and you are accordingly advised that the phrase "majority of the electorate" in act no. 728, sec. 20 (a), means a majority of the votes actually cast on the harness racing question in any particular county, and does not mean a majority of the registered or eligible voters in such county.