*In re* Denny.

---

IN THE MATTER OF THE PETITION OF DENNY FOR ADMISSION TO PRACTICE LAW.

[No. 19,534.    Filed February 1, 1901.]

CONSTITUTIONAL LAW.—*Amendments to Constitution.*—*Adoption by Electors.*—Article sixteen of the State Constitution requires that a majority of the electors of the State shall ratify a proposed amendment before it shall become a part of the Constitution. *pp. 105-109.*

JUDICIAL NOTICE.—*Election Returns.*—The Supreme Court takes judicial notice of election returns made to the Secretary of State. *p. 110.*

CONSTITUTIONAL LAW.—*Amendments to Constitution.*—*Submission.* —*Election.*—The fact that an amendment to the State Constitution was submitted to the people by an act of the General Assembly which was not in conformity with a law passed by a previous legislature, providing the manner in which constitutional amendments should be submitted, did not render the election held thereunder a special election. *pp. 110-112.*

SAME.—*Amendments to Constitution.*—*Adoption by Electors.*—*Majority.*—An amendment to the State Constitution was submitted to the electors of the State at a general election. The Governor's proclamation announced that 240,031 votes had been cast for, and

*In re* Denny.

144,072 against the amendment.  At the same election 664,094 votes were cast for presidential electors and 655,965 votes for Governor. *Held*, that the proposed amendment was rejected for want of a constitutional majority.  *pp. 112-124.*  Jordan J., dissents.

From the Marion Circuit Court.  *Reversed.*

*W. W. Woollen* and *Evans Woollen,* for appellant.

*T. E. Howard, W. L. Taylor,* Attorney-General, *Merrill Moores* and *C. C. Hadley,* for appellee.

BAKER, J.—Section 21 of article 7 of the Constitution, in force from November 1, 1851, reads: "Every person of good moral character, being a voter, shall be entitled to admission to practice law in all courts of justice."  At the election in November, 1900, a proposed amendment, to take the place of the foregoing provision, to the effect that "The General Assembly shall by law prescribe what qualifications shall be necessary for admission to practice law in all courts of justice" was submitted to the electors of the State.  On the assumption that the proposed amendment had been adopted, and on the further assumption that it was within the court's prerogative to prescribe qualifications by rule without waiting for the General Assembly to change the present statutory provisions on the subject, the Marion Circuit Court established rules and appointed a board of examiners.  Thereafter, the petitioner Mr. Denny applied to be admitted to practice law in the Marion Circuit Court, on the qualifications only that he was a person of good moral character and a voter in Marion county, Indiana.  On the trial, the court specially found these facts: Mr. Denny is a person of good moral character and a voter in Marion county, Indiana.  At the general election in Indiana on November 6, 1900, 655,965 votes were cast for various candidates for the office of Governor of Indiana. At an election held upon the same day throughout the State of Indiana, pursuant to an act of the General Assembly approved March 6, 1899 (Acts 1899, p. 560), there were cast for the amendment in question 240,031 votes and

*In re* Denny.

against it 144,072 votes. A motion was made for the admission of Mr. Denny to practice law in the Marion Circuit Court, and he declined to submit to an examination as to his qualifications to be admitted as provided by the rules of that court. As a conclusion of law the court stated that Mr. Denny was not entitled to admission; and judgment was entered accordingly. Mr. Denny appeals, and assigns that the conclusion of law is erroneous. The Attorney-General appears in support of the judgment. If the proposed amendment has not been adopted, the conclusion of law and the judgment can not be sustained.

The Constitution lays down the only procedure by which an amendment may be adopted: Article 16, §1. "Any amendment or amendments to this Constitution may be proposed in either branch of the General Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the General Assembly to be chosen at the next general election; and if, in the General Assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution. Section 2. If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately; and while an amendment or amendments which shall have been agreed upon by one General Assembly shall be awaiting the action of a succeeding General Assembly, or of the electors, no additional amendment or amendments shall be proposed."

The proposed amendment in question and one other re-

*In re* Denny.

ceived the affirmative votes of a majority of the members elected to each house of the General Assemblies of 1897 and 1899. It thereupon became the duty of the General Assembly of 1899 to provide for the submission of the proposed amendments to the electors of the State. For this purpose, the above mentioned act was passed, which provides: "That there shall be a vote taken by the people *at the next general election*" to be held on November 6, 1900, on the adoption or rejection of the proposed amendments; that the clerks of the circuit courts shall cause to be printed twice as many ballots, containing the two amendments, as there were votes cast in their respective counties for Governor at the general election in 1896; that there shall be printed at the left of each amendment the words "For the amendment" and "Against the amendment", and the voter shall make a cross with a blue pencil in the square to the left of whichever set of words he desires to vote; that the ballots shall be delivered to the election precincts in the same manner as ballots for voting for district and county officers are now delivered, and they shall be delivered to the voters before entering the election booth in the manner now provided by law for delivering the ballots to the voters; that the election board shall count and return the vote according to the general law governing elections; that after the returns in each county are tabulated, the clerk shall certify to the Secretary of State the total vote cast for and against each amendment; that after the secretary tabulates the returns from all the counties, he shall certify to the Governor the total vote for and against each amendment; that "if it shall appear that *a majority of all the votes cast at such election* were given in favor of the adoption of either or both of said proposed constitutional amendments, the Governor shall make proclamation, and it or they shall then become part of the Constitution of the State of Indiana".

The Governor's proclamation announced that 240,031 votes had been cast for, and 144,072 against, the proposed

*In re* Denny.

amendment in question, and 314,710 for, and 178,960 against, the other proposed amendment; but did not state whether either had been adopted or rejected.

In our system of government, a written constitution is the highest expression of law. None other emanates directly from the sovereign people themselves. It is the deliberate and affirmative utterance of the sovereign majority. It seems unnatural to say that the sovereign majority, the authors of the designedly permanent, the fundamental, the organic law, intended that any of its safeguards should be abrogated by a failure to demand the abrogation; that the indifference of the many should be a positive element in effecting an organic change desired by the few; that a judgment abolishing the writ of *habeas corpus* or the right of trial by jury should be taken by default. On the contrary, one would expect a provision that the charter of our liberties should stand unaltered until the sovereign majority, by affirmative action, expressed their desire for, and effected, a change. And such is the clear letter and spirit of article 16. If a majority of the electors of the State shall ratify a proposed amendment, it shall become a part of the Constitution; otherwise not. There is no room for construction. The language is too plain to admit of quibbling. "Majority" means "more than half". "Electors", with reference to an election, means, according to the lexicographers and universally accepted usage, "persons possessed of the legal qualifications entitling them to vote". The word "voters", on the other hand, has two meanings, "persons who perform the act of voting", and "persons who have the qualifications entitling them to vote". Constitutions are drafted with care. The framers of our Contstitution deliberately selected and used the words in the meaning of which there could be no ambiguity. The sentence, "If more than half of the persons in the State who possess the legal qualifications entitling them to vote shall ratify the proposed amendment, it shall become a part of the Con-

stitution", is a cumbersome equivalent.  The idea is clearly and more succinctly expressed in the wording of the Constitution.  No other standard for the adoption of proposed constitutional amendments may be set up by this court, becomingly or lawfully, than the one fixed by the Constitution, the affirmative ratification by "a majority of the electors of the State."  So, in any case, the question becomes one, not of constitutional construction, but of evidence.

It is universally held that, in the absence of a provision for registration, the number of persons who possess the qualifications entitling them to vote at a given election is determined by the election itself.  Deaths, minors' coming of age, disfranchisements, removals from the State, or from the county, township, ward, or precinct, within certain limits of time, make the number of electors a continually variable quantity.  But when a person goes to the polls in his precinct, is passed by the challengers, is accepted by the election officers, and has his name enrolled on the poll lists as having voted, he thereby furnishes proof of the fact that he is an elector, a person possessed of the legal qualifications entitling him to vote at that election.  And the poll lists furnish evidence of the total number of electors.  And this evidence is just as definite and certain as that which could be afforded by a registration of the persons entitled to vote at that election, for the poll lists themselves form a registration.

After the proposed amendments were approved by the General Assemblies of 1897 and 1899, it became the duty of the General Assembly of 1899 to submit them to the electors of the State.  It was within the power of that General Assembly to provide for submitting them at a general, or at a special, election.  The General Assembly enacted that a vote on the proposed amendment should be taken at the next general election.  The trial court found that 240,-031 votes were cast in favor of the adoption of the proposed amendment in question.  The trial court probably made

the finding from the facts within its judicial knowledge. It was unnecessary for the parties to prove the vote. This court takes judicial notice of the returns made to the Secretary of State; and if the trial court had stated a different number, the finding would be ignored, because this court is charged with judicial knowledge of the fact that 240,031 is the correct number. From the same source and with the same authenticity this court knows judicially that at the same election 664,094 votes were cast for presidential electors, 655,965 votes for Governor, and 493,670 votes on the other proposed amendment. Since we know absolutely that more than twice 240,031 electors of the State participated in the election, we hold that the proposed amendment in question was rejected.

It is argued that the proposed amendment was submitted at a special election, and that therefore this court can not take judicial knowledge of any returns except those of the alleged special election. The argument that the election was special is based on §62 of the election law (Acts 1889, p. 184, §6258 Burns 1894). By that section the General Assembly of 1889 undertook to say that whenever any constitutional amendment is required by law to be submitted to popular vote, the state board of election commissioners shall cause a brief statement of the same to be printed on the state ballots and the words "yes" or "no" under the same, so that the elector may indicate his preference by stamping at the place designated in front of either word. The argument then proceeds: Since the General Assembly of 1899 did not conform to the law of 1889, the act of 1899 submitting the proposed amendments to the electors of the State must be held to be a provision for a special election. In the first place, it is somewhat unusual to give an act of one General Assembly the effect of a constitutional restraint upon the action of its successors. In the next place, the General Assembly of 1889 was not the proper one to take action. There were no constitutional amendments pending,

*In re* Denny.

approved by it, to be submitted to the electors of the State. The Constitution points out the steps to be taken. If one General Assembly approves a proposed amendment, it is referred to the next General Assembly. If that body approves the proposed amendment, it thereupon becomes the duty of that body to submit the question to the electors of the State. It is only by virtue of the Constitution's command to that body that the proposed amendment may be submitted by a legislative act. Prior to the designated time, there is no constitutional power in any general assembly to speak authoritatively on the subject of the submission of proposed amendments. And finally, the act of 1899 is a clear expression, by the only General Assembly empowered to speak, of the intention to submit the question "at the next general election". On November 6, 1900, there was but one election in Indiana, and that was the "general election" at which the General Assembly of 1899 determined to submit the proposed amendments to the electors of the State; and every person who voted at that election thereby furnished proof that he was an elector of the State. There was but one voting place in each precinct, but one set of election officers at each voting place, but one poll list, but one delivery of tickets to each elector, but one standard of qualifications for all electors no matter what they voted upon, but one act of voting by each elector, and but one recording of the fact that he had voted. But even if the act of 1899 were legitimately open to the construction that the proposed amendments were submitted at a special election, the proposed amendment in question has been rejected. First. The fact that 240,031 votes were counted for, and 144,072 against, the proposed amendment in question, is not definite proof that only 384,103 persons cast ballots on the proposition submitted at the alleged special election. At any election on a constitutional amendment, whether general or special, the question is, Has the amendment been ratified by a majority of the electors of the State?

The act of 1899, viewed as a submission at a general election, is deficient in not providing for a return of the total number of electors marked on the poll lists as having voted; and viewed as a submission at a special election on the constitutional amendments only, it is deficient in not providing for a return of the total number of electors whose ballots on the constitutional amendments were deposited in the ballot box.   One's standing as an elector, a person qualified to vote, is not destroyed by the election officers' decision to throw out his ballot on the ground, real or not, that it is mutilated or bears a distinguishing mark.   Second.   The two proposed amendments were printed on a single ballot. If the election were special as to them, and if this court could look only to the returns of the alleged special election, how can the court properly shut its eyes to the fact that the 240,031 votes cast for the proposed amendment in question are less than half of the 493,670 votes recorded as having been counted on the other?   What ones of the 493,670 are to be held as not being "electors of the State"?

It is also urged that, because the number of persons in the State who were entitled to vote at the election on November 6, 1900, in excess of the 664,094 persons who were counted as having voted for presidential electors, is a matter of conjecture, it is therefore permissible to indulge in the conjecture that there were no more electors (persons entitled to vote) on the proposed amendment in question than the 240,031 that were recorded as having voted for, and the 144,072 against, its adoption.   The difference is vital.   On the conjecture that there were more electors of the State than 664,094, by so much the more has the proposed amendment failed to be ratified by a majority of them.   But it is not necessary to deal in that, or in any other, conjecture to hold that the proposed amendment has been defeated.   The absolute judicial knowledge (evidence of the very highest class) that there were *at least* 664,094 persons entitled to vote on the proposed amendment, proves

that the proposed amendment was defeated for a lack of a majority. On the the other hand, to hold that the proposed amendment has been adopted, requires the acceptance of the conjecture that only the persons who succeeded in having their votes counted for and against the proposed amendment were legally qualified to vote on the subject. And this in the face of the facts that 493,670 votes were counted for and against the other proposed amendment, that 655,965 were counted for candidates for Governor, and that 664,094 were counted for candidates for presidential electors. It is possible to conjecture that there may have been more persons entitled to vote than the definitely known number of 664,094. But how can it be made a matter of conjecture that there were less?

The Attorney-General invites our consideration of the claim that "a majority of the electors of the State" was not intended to mean "a majority of *all* the electors of the State", because the constitutional convention rejected a substitute inserting *"all"* before "the electors", and because the article as adopted requires a proposed amendment to be agreed to by "a majority of *all* the members elected to each house". First. The substitute was rejected, not on account of the presence of the word *"all"*, but because it ran counter to the plan favored by the convention. The substitute was: "No amendment shall be made to the Constitution unless the same shall have been *called for* and approved by a majority of all the voters (electors) of the State". 2 Const. Debates pp. 1938-1942. Second. "A majority of the electors of the State" is as comprehensive as "a majority of all the electors of the State", just as "a majority of the members elected to each of the two houses" is as wide-embracing as "a majority of all the members elected to each house". The one form of expression may be more intensive than the other, but it is not more inclusive. Third. That the convention attached no importance to the presence

or absence of the word *"all"* is shown by the use of "a majority of the members elected to each of the two houses" as the equivalent of "a majority of all the members elected to each house", in section 1 of this article 16.

The Attorney-General further contends that section 2 of article 16 shows that only the votes counted for and against the proposed amendment in question should be considered in determining the number of "the electors of the State". Section 2 provides: "If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately." The controlling idea to be expressed was this: If two or more amendments are to be submitted at the same time, they ought not to be voted upon *en masse,* but separately, so that each may stand or fall on its own merits. Section 2 directs the submission of two or more amendments to be made "in such manner that the electors shall vote for or against each of such amendments *separately";* but does not undertake to state the effect of the votes cast on such submission. That effect is expressed in section 1. It is incredible that it was intended that a different effect should follow from the vote "if two or more amendments are submitted at the same time" from that which would follow the submission of one amendment: The only condition under which an amendment "shall become a part of this Constitution" is that "a majority of the electors of the State shall ratify the same". No other terms of adoption are named in any part of the article; and yet the argument of counsel assumes that the positive declaration in section 1 is destroyed by their inference that the provision for taking a vote "for" and "against" means that only the votes counted "for" and "against" are to be considered. Counsel's inference would destroy as well the direct command in section 1 that a proposed amendment "shall be agreed to by a majority of the members elected to each of the two houses", since a

*In re* Denny.

record of the votes "for" and "against" in each of the two houses is directed to be entered on their journals. But counsel do not claim or even suggest that, under the plain language of the article, a proposed amendment may be agreed to in either house by a majority of those voting "for" and "against" or by any number less than "a majority of the members elected." When the number of members elected to the senate is definitely known, that is the number of which it takes more than half to act affirmatively upon a proposed amendment. Similarly with the house; it is not a majority of the quorum or those voting "for" or "against", but it is a majority of the body that is required. And similarly with the electors of the State; when the number of electors is definitely known, that is the number of which it takes more than half to act affirmatively upon a proposed amendment. The standard is made the same in the three bodies. And if the court has the means of knowing judicially the number composing each body, the rule is as easily applied in one body as in another.

The history of the article confirms our recognition of its plain meaning. The original resolution provided for ratification by "a majority of the qualified voters." A motion was made to instruct the committee on future amendments to substitute the words, "a majority of all the votes cast for and against the same". The motion, modified so as to require the committee only to consider the advisability of the substitution, was carried. The committee rejected the phrase, "a majority of all the votes cast for and against the same", and reported the following: "* * * it shall be their duty to submit the same to the people at the next general election, * * * and if a majority of all the electors voting at said election for members of the house of representatives * * *". In the convention, the following phraseology was agreed upon: "* * * submit such amendment or amendments to the qualified electors of the State, and if a majority of said electors shall ratify the

same,  *  *  *  ." After the committee on revision and
phraseology had excised the word "qualified", the article
stood as was finally approved by the convention and ratified
by the people. Const. Journal, pp. 69, 444, 693, 830-833,
837, 841, 842, 971, 975, 976; 2 Const. Debates, pp. 1258-
1260, 1641, 1913-1918, 1938-1942, 2076. It is noteworthy
that the unlimited words "a majority of the electors of the
State" were adopted after an affirmative rejection, first,
by the committee, of the limiting words "a majority of the
votes cast for and against the same", and secondly, by the
convention, of the limiting words "a majority of the elect-
ors voting for members of the house". To hold in this
case that the proposed amendment has been ratified, it
would be necessary to strike out of article 16 the words
"a majority of the electors of the State" and to substitute
therefor "a majority of the votes cast for and against
the same",—a process just the reverse of that carried
out by the framers of our organic law. To hold in this
case that the proposed amendment has been defeated, re-
quires only an obedience to the clear letter and spirit of the
Constitution, without adding to or taking from it one jot
or tittle. And such obedience is our duty, for the Constitu-
tion is as binding upon the judicial department of the State
as it is upon the legislative or executive.

The article relating to amendments of the organic law has
been before this court but once. In *State* v. *Swift,* 69 Ind.
505, the question concerned the adoption of a proposed
constitutional amendment, which was submitted to the elect-
ors of the State at the election for township officers in
April, 1880. The only vote certified to the Secretary of
State was the vote on the proposed amendment. The vote
was 169,483 for, and 152,251 against, the proposed amend-
ment. The elections of township officers in the various
townships of the State were purely local elections. The re-
turns thereof are not made to the Secretary of State and do
not become a part of the archives of the State. It was held,

*In re* Denny.

first, that "it requires at least a majority of all the votes cast at the same election to ratify a constitutional amendment"; and second, that the proposed amendment had not been adopted, on the ground that the court judicially knew that more electors had participated in the township elections than had voted for and against the proposed amendment; that the court could not definitely say that a majority of the electors of the State had ratified the proposed amendment, and therefore it did not affirmatively appear that it was adopted; and that the court could not definitely say that it had failed to receive the approval of a majority of the electors of the State, and therefore it had not been rejected, but might be resubmitted.    The second proposition was decided incorrectly, for courts will not take judicial notice of the results of local elections.    17 Am. & Eng. Ency. of Law (2nd ed.) 898.    The error in the *Swift* decision, as well as the distinction between that case and one like the present, is pointed out in the dissenting opinion of Mr. Justice Niblack: "If the amendment under discussion had been submitted to the electors of the State at, and as a part of, a general election, and if the returns of that general election had shown affirmatively that a majority of those voting at such election had not voted to ratify such amendment, then quite a different question would have been presented for our consideration.    There is good authority for holding that in such an event the amendment would not have been ratified.    *People* v. *Garner,* 47 Ill. 246; *People* v. *Wiant,* 48 Ill. 263.    But no such element enters into this case.    *    *    *    Township elections are local and not general in their character, and returns from them are only made to the clerks of the respective counties, and are not made a part of the archives of the State, as the returns of the general elections are.    We are therefore unable to take judicial notice of the aggregate number of votes cast at those township elections on the day the amendments were voted upon.    That is a subject about which we judicially

know nothing, and concerning which we can presume nothing, adverse to the amendment under consideration. * * This is the essential point of difference between me and my brethren who speak for the court.".

In the case of *City of South Bend* v. *Lewis,* 138 Ind. 512, a statute providing for an election on the question of the union of a city and a town was before the court for construction. It was very properly held that, by the terms of the statute, the union was affected if a majority of those in each municipality who voted upon the question voted in favor of the union. The statute required the city council and the town board to agree upon a day on which an election should be held for the people of the city and of the town to vote on the question of union. The day selected was one on which there was an election of officers in the city, but none in the town. In view of the fact that only a majority of the votes "given on the question of union" was necessary to an affirmative decision, it was held that the question as to the number of votes cast in the city for officers was immaterial. The statute in that case and the constitutional provision in this are essentially different; but the court there recognized and, as it were, forecast the doctrine that is controlling here. Among other things the court said: "The learned counsel for the appellee seems to rely upon the provision that a town and a city may be united if a 'majority of the qualified voters of the town and a majority of the qualified voters of the city' vote in favor thereof. If this section stood alone, it might be urged that a majority of all the voters are necessary, and the number of votes cast at the city election for officers should be taken as additional means for ascertaining the number of legal voters of the city. But the other sections of the act clearly show that such was not the intent of the framers of the act. * * * Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at 'such election', a majority of all the votes cast at the

election is meant, and not merely a majority of the votes cast on that particular question."

The conclusion at which we have arrived is sustained, in our opinion, by the overwhelming weight of authority. The following decisions are directly in point: *People* v. *Town of Berkeley,* 102 Cal. 298, 36 Pac. 591, 23 L. R. A. 838; *People* v. *Brown,* 11 Ill. 478; *People* v. *Garner,* 47 Ill. 246; *People* v. *Wiant,* 48 Ill. 263; *Chestnutwood* v. *Hood,* 68 Ill. 132; *Belknap* v. *City of Louisville,* 99 Ky. 474, 36 S. W. 1118, 34 L. R. A. 256; *Stebbins* v. *Judge,* 108 Mich. 693, 66 N. W. 594; *Bayard* v. *Klinge,* 16 Minn. 249; *Everett* v. *Smith,* 22 Minn. 53; *Slingerland* v. *Norton,* 59 Minn. 351, 61 N. W. 322; *Smith* v. *Board, etc.,* 64 Minn. 16, 65 N. W. 950; *State* v. *Powell* (Miss.), 27 South. 927, 48 L. R. A. 652; *State* v. *Winkelmeier,* 35 Mo. 103; *State* v. *Sutterfield,* 54 Mo. 391; *State* v. *Mayor of St. Louis,* 73 Mo. 435; *State* v. *Francis,* 95 Mo. 44, 8 S. W. 1; *State* v. *McGowan,* 138 Mo. 187, 39 S. W. 771; *State* v. *Lancaster Co.,* 6 Neb. 474; *State* v. *Babcock,* 17 Neb. 188, 22 N. W. 372; *State* v. *Bechel,* 22 Neb. 158, 34 N. W. 342; *State* v. *Anderson,* 26 Neb. 517, 42 N. W. 421; *State* v. *Van Camp,* 36 Neb. 91, 54 N. W. 113; *Bryan* v. *City of Lincoln,* 50 Neb. 620, 70 N. W. 252, 35 L. R. A. 752; *Tecumseh Nat. Bank* v. *Saunders,* 51 Neb. 801, 71 N. W. 779; *Enyart* v. *Trustees,* 25 Ohio St. 618; *State* v. *Foraker,* 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422. And see *Sanford* v. *Prentice,* 28 Wis. 358, on the difference between an elector and a voter.

In *People* v. *Town of Berkeley,* the court said of a constitutional provision: "These words" (whenever a majority of the electors voting at a general election shall so determine) "clearly do not indicate that only a majority of the electors voting upon the proposition is necessary, but would seem to imply that a majority of all those voting at the election is required."

In *People* v. *Brown,* the constitution provided: "When-

ever a majority of the voters of such county, at any general election, shall so determine." The court held: "It does not mean a majority of those voting on the question to be submitted, but a majority of all the legal voters of the county."

In *People* v. *Wiant,* the language of the constitution under consideration was "a majority of the voters". Held, that a majority of the votes cast on the question was insufficient.

In *Stebbins* v. *Judge,* the statute forbade the incurrence of bonded indebtedness "unless the qualified electors of said city, voting in their respective wards, shall have authorized the issuing of said bonds by a majority of their votes cast at any regular election, or at a special election called for the purpose of voting upon such question." The vote in question was taken at a regular election. Held, that the decision was determinable by a majority of the votes cast at the election, not by a majority of the votes cast upon the question.

In *Bayard* v. *Klinge,* the words of the constitution under examination were "a majority of such electors". The court decided that a majority of those voting on the question was not sufficient.

In *Slingerland* v. *Norton* and in *Smith* v. *Board,* it was held that the whole number voting at an election must be determined from the poll lists, not from the return of the votes counted as effective.

The language of the constitution under consideration in *State* v. *Powell* was "a majority of the qualified electors voting". It was held that the proposed constitutional amendment could only be adopted by a majority of those voting at the same time for any purpose.

In *State* v. *Winkelmeier,* the language of the statute was "a majority of the legal voters". More than 13,000 voters participated in the election. 5,035 favored, and 2,001 opposed, the adoption of the question submitted. The court

said: "It is evident that the vote of 5,000 out of 13,000 voters is not the vote of a majority, and, under the act quoted, no authority was given the city."

In *State* v. *Babcock,* the constitution provided that "proposed amendments  *  *  *  shall be  *  *  *  published for three months immediately preceding the next election of senators and representatives,  *  *  *  and if a majority of the electors voting at such election adopt," etc.  Held, that a majority of those voting on the amendment was insufficient.

In *State* v. *Bechel,* the constitution provided: "No such general law shall be passed by the legislature, granting the right to construct and operate a street railroad within any city, town, or incorporated village, without first requiring the consent of a majority of the electors thereof."  The question of having a street railroad was submitted at a general city election, at which, 8,146 voters participated, of whom 1,650 voted for, and 1,470 against, the railroad.  The court said: "It is impossible for us, by any system of logical reasoning, to say that the election held in the city of Omaha on the 3rd day of May, 1887, was other than one election.  *  *  *  That being the case,  *  *  *  the consent of a majority of the electors was not given."

In *State* v. *Foraker,* the constitutional provision was that a proposed amendment should be published "for six months preceding the next election for senators and representatives, at which time the same shall be submitted to the electors,  *  *  *  and if a majority of the electors voting at such election shall adopt," etc.  Held, that a majority of those voting on the amendment was insufficient.

There are many other cases that are in harmony with our conclusions, but in which the constitutional or statutory provision under consideration was found, as in our own case of *City of South Bend* v. *Lewis,* to condition the adoption of a particular question only upon its receiving a majority of the votes cast for and against it:  *Gavin* v. *City of*

*Atlanta,* 86 Ga. 132, 12 S. E. 262; *Mayor, etc., v. Wilson,*
96 Ga. 251, 23 S. E. 240; *Green v. State Board, etc.,* (Idaho), 47 Pac. 259, 44 Cent. L. J. 383; *Holcomb v. Davis,* 56
Ill. 413; *County Seat of Linn County,* 15 Kan. 500; *Commissioners v. Winkley,* 29 Kan. 36; *State v. Echols,* 41 Kan.
1, 20 Pac. 523; *Fiscal Court v. Trimble* (Ky.), 47 S. W.
773, 42 L. R. A. 738; *Jones v. Commonwealth* (Ky.), 47 S.
W. 328; *Rush v. Commonwealth* (Ky.), 47 S. W. 586; *Duperier v. Viator,* 35 La. Ann. 957; *Citizens, etc., v. Williams,* 49 La. Ann. 422, 21 South. 647, 37 L. R. A. 761;
*Walker v. Oswald,* 68 Md. 146, 11 Atl. 711; *State v. Cornell*
(Neb.), 74 N. W. 59, 39 L. R. A. 513; *State v. Wurts,* 61
N. J. L. 163, 38 Atl. 1099; *Bott v. Secretary of State,* 62 N.
J. L. 107, 40 Atl. 740; *People v. Trustees,* 70 N. Y. 28;
*Smith v. Proctor,* 130 N. Y. 319, 29 N. E. 312, 14 L. R. A.
403; *Southerland v. Goldsboro,* 96 N. C. 49, 1 S. E. 760;
*Duke v. Brown,* 96 N. C. 127, 1 S. E. 827; *State v. Barnes,*
3 N. Dak. 319, 55 N. W. 883; *State v. Langlie,* 5 N. Dak.
594, 67 N. W. 958, 32 L. R. A. 723; *State v. Grace,* 20 Ore.
154, 25 Pac. 382; *Cocke v. Gooch,* 5 Heisk. (Tenn.) 294;
*Bouldin v. Lockhart,* 3 Baxt. (Tenn.) 262; *Braden v.
Stumph,* 16 Lea (Tenn.) 581; *Davis v. Brown,* 46 W. Va.
716, 34 S. E. 839; *Gillespie v. Palmer,* 20 Wis. 544; *St.
Joseph Tp. v. Rogers,* 16 Wall. 644, 21 L. Ed. 328; *County
of Cass v. Johnston,* 95 U. S. 360, 24 L. Ed. 416; *Douglass v. County of Pike,* 101 U. S. 677, 25 L. Ed. 968; *Carcoll County v. Smith,* 111 U. S. 556, 4 Sup. Ct. 539, 28 L.
Ed. 517; *Knox Co. v. Ninth Nat. Bank,* 147 U. S. 91, 13
Sup. Ct. 267, 37 L. Ed. 93; *Armour Bros. Banking Co. v.
Board, etc.,* 41 Fed. 321.

In the great majority of these cases the principles that
control us in our holding in the present case are distinctly
recognized. For example: In *County Seat of Linn County,* 15 Kan. 500, the phrase "a majority of the electors of
the county" was considered in connection with the returns
of a special election at which the particular question was

the only matter to be voted upon.   Mr. Justice Brewer, speaking for the court, said:  "We do not doubt the restricting power of the constitutional provision; and whenever by any of the ordinary or prescribed means of ascertaining the fact, it appears that a majority of the electors have not consented to the change, no change can be had. *  *  *"  In "cases where two or more questions are submitted at the same election, and more votes are cast upon one question than upon another,  *  *  *  the highest number of votes cast upon any one question is clear evidence of the number of voters, which may not, in view of any such constitutional restriction as above quoted, be disregarded in any contest arising as to the decision of the other questions."

There may be a few cases that can not be reconciled with the great weight of the decided law, but they probably all belong to the class of which *Gillespie* v. *Palmer,* 20 Wis. 544, may be taken as illustrative.   In that case, the constitution provided that the legislature might extend the right of suffrage, but that the law should not go into effect until "submitted to a vote of the people at a general election and approved by a majority of all the votes cast at such election".   The court was called upon to decide whether or not a law extending the right of suffrage to negroes had been ratified.   More votes were cast for the law than against it, but it did not receive a majority of all the votes cast at the election on other matters.   The court held that the law had been ratified.   In the later case of *Sawyer* v. *Dodge, etc., Ins. Co.,* 37 Wis. 503, 524, the court said of the Gillespie case that it "has been subjected to the criticism that the court decided it in accordance with 'the logic of the war' rather than 'the logic of the law' ".   And in *Bound* v. *Wisconsin, etc., R. Co.,* 45 Wis. 543, 579, Chief Justice Ryan classed *Gillespie* v. *Palmer* as being one of several cases "which have long been made a reproach to the court, as judgments proceeding upon policy rather than upon principle."

*In re* Denny.

Judgment reversed, with directions to restate the conclusion of law in consonance with this decision.

Hadley, J., concurring. I rest my concurrence in the result upon the fact that the amendment involved in this appeal did not receive a majority of the votes cast upon the subject of the amendments, and cast for and against amendment number one.

Jordan, J., dissents.

### DISSENTING OPINION:

JORDAN, J.—I dissent from both the reasoning and the conclusions in the prevailing opinion in this case for the reasons herein given.

The General Assembly of 1897 proposed two amendments to the State's Constitution, one of which was to amend section 2 of article 7, and the other, being the one here involved, proposed to change or amend section 21 of the same article, by substituting or inserting in lieu of that section as originally adopted the following provision: "The General Assembly shall by law prescribe what qualifications shall be necessary for admission to practice law in all courts of justice." These two amendments after being agreed to by the General Assembly of 1897, were by that body referred to the General Assembly of the State to be chosen at the next general election. The amendments mentioned were both considered and agreed to by the General Assembly of 1899, and that body in obedience to the requirements of the Constitution passed an act whereby these amendments were submitted to the electors of the State for their ratification or rejection. See Acts 1899, p. 560. Section 1 of this statute provided that a vote should be taken by the people of the State on the adoption or rejection of the proposed amendments at the next general election to be held on the first Tuesday after the first Monday in November, 1900, and further provided that the clerks of circuit courts throughout the State should cause ballots to

*In re* Denny.

be prepared of white paper upon which the proposed amendments should be printed and be designated as numbers one and two, respectively. Section 1 further provided as follows: "There shall be printed on the ballots to the left of each separate amendment the words 'For the amendment', and underneath the words 'Against the amendment', and the voter shall make a cross with a blue pencil in the square to the left of whichever set of words he desires to vote. Said ballots shall be delivered to the election precincts in the same manner as ballots for voting for district and county officers are now delivered, and they shall be delivered to the voters before entering the election booth in the manner now provided by law for delivering the ballots to the voters; and the election board will count out such ballots in the same manner as they count out the votes given for district and county offices, and the election shall be held and in all respects governed by the laws governing elections, except as hereinafter provided." Section 2 of the act reads as follows: "And after the returns are tabulated and counted, the clerk of the circuit court shall certify under the seal of his office to the Secretary of State the total vote given for each amendment, and the total vote cast against each amendment, and when the Secretary of State shall have tabulated the same from all the counties of the State, the said Secretary of State shall certify to the Governor the total vote for and against each amendment. If it shall appear that a majority of all the votes cast at such election were given in favor of the adoption of either or both of said proposed constitutional amendments, the Governor shall make proclamation, and it or they shall then become a part of the Constitution of the State of Indiana."

On November 30, 1900, the Governor of the State in pursuance of section two of the above statute issued a proclamation whereby he announced and proclaimed the whole number of votes cast for and against each of said amendments at the election at which they had been submitted for

ratification or rejection as certified to him by the Secretary of State. The number of votes cast for and against the amendment designated as number two as disclosed by the Governor's proclamation is the same number as that which is stated in the court's special finding.

The provisions of sections 1 and 2 of article 16 of our Constitution which relate to the method of proposing and adopting an amendment or amendments thereto are as follows: Sec. 1. "Any amendment or amendments to this Constitution may be proposed in either branch of the General Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the General Assembly to be chosen at the next general election; and if, in the next General Assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution." Sec. 2. "If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately; * * *."

The solution of the question presented depends upon the interpretation to be given to the following clause in section 1 of article 16, "*and if a majority of said electors shall ratify the same,*" etc. (Our italics.) The contention of counsel for appellant is that the amendment in controversy can be held to be ratified only upon receiving a majority of all the votes cast at the general election held on the same day upon which a vote, as provided by the statute, was taken on ratifying or rejecting said amendment. This is

asserted to be' the test, whether such votes were cast upon the question of ratifying and rejecting the amendment or were cast for the several candidates for Governor or other state officials whose names were printed upon the state ballots which were voted by the electors at the said general November election. Counsel insist that the difficulty which confronts us in determining the question herein involved is not one of construction, but is one of evidence, and the argument is advanced that the rule to be enforced is this: "It being impossible to ascertain accurately the number of electors, the court will accept the testimony of the ballot-box as conclusive, but, in doing so, will recognize that every person who has put in the box a ballot for whatsoever, has thereby proved himself an elector, and must be counted as one of the electors." In support of this proposition he refers to the following decisions which relate to the adoption of constitutional amendments. *State* v. *Babcock,* 17 Neb. 188, 22 N. W. 372; *Tecumseh Nat. Bank* v. *Saunders,* 51 Neb. 801, 71 N. W. 779; *State* v. *Foraker,* 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422; *State* v. *Powell* (Miss.), 27 South. 927, 48 L. R. A. 652; *State* v. *Swift,* 69 Ind. 505. The following cases which did not involve the adoption of constitutional amendments are also relied upon to sustain further the proposition. *People* v. *Town of Berkeley,* 102 Cal. 298, 36 Pac. 591, 23 L. R. A. 838; *People* v. *Wiant,* 48 Ill. 263; *Stebbins* v. *Judge,* 108 Mich. 693, 66 N. W. 594; *Bayard* v. *Klinge,* 16 Minn. 249; *State* v. *Winkelmeier,* 35 Mo. 103; *State* v. *McGowan,* 138 Mo. 187, 39 S. W. 771; *Enyart* v. *Trustees,* 25 Ohio St. 618. An examination of these cases, however, discloses that, in the main at least, they can not be accepted as influential or helpful authorities in aiding us to solve the question presented by this appeal, for the reason that the provisions of the particular constitutions or statutes therein involved are materially different from the provisions of our own Constitution in regard to the method of adopting proposed con-

stitutional amendments.    Section 1 of article 15 of the
constitution of Nebraska, after providing that either branch
of the legislature 'may propose amendments to the consti-
tution, and if the same are agreed to by the legislature it is
then provided that they shall be published in the manner
designated, "for three months immediately preceding the
next election of senators and representatives, at which elec-
tion the same shall be submitted to the electors for approval
or rejection, and if a majority of the electors voting at such
election adopt such amendments, the same shall become a
part of the constitution."

In the case of *State* v. *Babcock,* 17 Neb. 188, 22 N. W.
372, it appears that a proposed amendment to the constitu-
tion, under the above provision, was submitted at the gen-
eral election held in that state in November, 1884, for the
election of a governor, senators, and representatives. While
the amendment in question received a majority of the total
vote cast at such election for and against its adoption,
still it did not receive a majority of the total vote cast at
said election for senators and representatives. A majority
of the court in that case held that inasmuch as under the
plain provisions of the constitution the amendment was
required to be submitted to the electors of the state for their
approval or rejection at the next election of senators and
representatives, and was also further required to receive a
vote in favor of its adoption equal to a majority of all who
voted at said election for senators and representatives, in
order to secure its adoption, and as such a result had not
been attained in respect to the amendment in controversy,
therefore, it had not been adopted as required by the consti-
tution.    The holding of the same court in the appeal of
*Tecumseh Nat. Bank* v. *Saunders,* 51 Neb. 801, 71 N. W.
779, which involved an amendment to the constitution, is to
the same effect.    It is held, however, in this latter case that
the vote cast throughout the state for senators and repre-
sentatives is not to be accepted as the sole criterion.    That

while it was true that the amendment must be submitted to the electors at a general election for senators and representatives, nevertheless the following constitutional provision "if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this constitution," must be interpreted to mean that in order to secure the adoption of a proposed amendment "it is necessary that the favorable votes be in excess of one-half of the highest aggregate number of votes cast at said election, whether such highest number be for the selection of an officer or upon the adoption of a proposition."

The provisions of the constitution of Ohio and Nebraska in regard to the adoption of proposed amendments are virtually alike, except the period of publication prior to the submission of the amendments to the electors, under the constitution of Ohio, is fixed at six instead of three months "preceding the next election for senators and representatives, at which time the same shall be submitted to the electors, for their approval or rejection; and if a majority of the electors, voting at such election shall adopt such amendment it shall become a part of the constitution." Consequently, in the case of *State* v. *Foraker,* 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422, the supreme court of that state, under this provision of its constitution, held that before an amendment could be considered as adopted it must receive a majority of the votes of all electors voting at the election for senators and representatives at which election the amendment was required to be submitted.

In the case of *State* v. *Powell* (Miss.), 27 South. 927, 48 L. R. A. 652, the constitution of Mississippi, as held by the supreme court in that appeal, seems to have contained the following provision in respect to the adoption of constitutional amendments: "If it shall appear that a majority of the qualified electors voting for members of the legislature shall have voted for the proposed amendments",

This the court held to be the criterion, and hence it was affirmed that the proposed amendments must receive a majority of all the votes cast at such election for any purpose before they could become a part of the constitution; that a majority of all who voted on the adoption and rejection of the amendment was not sufficient.

It is certainly evident that these decisions of Nebraska, Ohio and Mississippi courts involved constitutional provisions so unlike or different from the one contained in the Constitution of this State that they virtually afford no aid in arriving at a correct interpretation of the clause or provision in controversy. The case of *State* v. *Swift,* 69 Ind. 505, may be said fully to sustain the contention of counsel for appellant, and the reasoning and conclusion of the majority opinion herein. That case, however, was decided by a bare majority of this court as then constituted, judges Niblack and Scott dissenting. The amendments therein involved were by an act of the legislature submitted to a vote of the electors at an election held on the first Monday in April, 1880, that day being the one upon which an election was held throughout the State for choosing township officers. The election in respect to the amendments involved was the only one which required a state canvass of the votes cast, and they, as it appears, received a favorable majority of over 17,000 of the total vote cast at said election upon the question of their ratification and rejection. Notwithstanding this fact, however, the court held, in effect, that the amendments had not been ratified because it did not affirmatively appear that the majority so received by them was equal to a majority of all the votes cast at said election for other purposes. It was also further affirmed by the court that the act of the legislature whereby the amendments in dispute were submitted to the electors was defective in not providing for a count of the aggregate number of votes cast at the said April election at which the proposed amendments were submitted. Judges Niblack and

Scott, the dissenting members of the court, each filed forcible dissenting opinions in which they affirmed the well settled rule that a majority of all the votes cast upon a proposition is sufficient for its adoption in the absence of some constitutional or statutory provision to the contrary.

The supreme court of Nebraska in *State* v. *Babcock,* 17 Neb. 188, 22 N. W. 372, criticizes the Swift case and expressly disapproves the reasoning by which the final conclusion therein was reached. The doctrine enunciated in the Swift case under the facts therein is certainly incompatible with the later holding of this court in *City of South Bend* v. *Lewis,* 138 Ind. 512. It will be readily observed that the Constitution of this State is silent in reference to the particular election at which the amendments shall be submitted by the legislature to the electors for their ratification or rejection. It is equally silent in regard to what shall be the criterion or standard by which the required majority shall be measured. It would, therefore, reasonably appear that our Constitution does not profess to control such matters, but has left them to the sound discretion of the legislature. In *State* v. *Babcock, supra,* relied upon by appellant, the court in respect to the constitutional requirements of that state said: "The submission must be at an election when senators and representatives are to be elected, and a majority of those voting at such election are required to vote in favor of the proposition to adopt the same. In the absence of a statute or constitutional provision requiring a majority of all the votes cast to be in favor of a proposition, there is no doubt that a majority voting upon that question would be sufficient. In such case, no doubt, the failure of a party to vote upon the question may be considered as tacit assent to the will of the majority of those voting thereon; but such a rule cannot apply where a majority of the electors of the state voting at the election are required to vote in favor of a proposition to secure its adoption."

In determining the question at issue in the case at bar

the court was not confronted with any such express provision of the Constitution of this State as was embraced in that of the state of Nebraska. In the case of *City of South Bend* v. *Lewis*, 138 Ind. 512, the question involved related to the interpretation of the provisions of the statute of this State which control the consolidation or union of an incorporated town and an incorporated city. See §§4208-4217 Burns 1894, §§3233-3242 R. S. 1881 and Horner 1897. Section 6 of this statute (§4213 Burns 1894) among other things provides: "If a majority of the votes given in the town as well as a majority of the votes given in the city are in favor of union or annexation," then and in that event the trustees of the town and the common council of the city are required to meet and by resolution declare the town and city united. An election for the union of the town of Myler and the city of South Bend was fixed for the 3rd day of May, 1892, the same being the day provided by law for holding general city elections in South Bend and other cities of the same class throughout the State for the election of city officers. At the election 1,750 votes were cast in said city in favor of the proposed union, and 237 votes against it. In the town of Myler thirty-nine votes were cast in favor of the proposition, and six against. The whole number of votes cast in the city of South Bend at said election for candidates for city offices was over 5,000. The question presented in that appeal was whether the proposition for annexation required a majority, only, of the votes for and against, or whether it was required to receive an affirmative vote of a majority of all persons who voted at the general city election held at the same time. This court in that case held that a majority of the votes cast for and against the proposition to consolidate was sufficient, although not equal to a majority of all the votes cast for candidates in the city of South Bend at the general city election held on the same day. The court in a well considered opinion by Dailey, J., reviewed a great many of the authorities bearing upon the

*In re* Denny.

question, and in the course of its opinion, on p. 536, said: "We think it clearly appears that four leading principles may be considered as fully established, namely: (1) Where a measure is proposed to the people, and its adoption made to depend on a vote of the majority, those who do not vote are considered as acquiescing in the result declared by those who do vote, even though those voting constitute a minority of those entitled to vote. (2) Where a question is required to be submitted at a certain regular election, and is made to depend upon a majority of the votes cast at 'such election,' a majority of all the votes cast at the election is meant, and not merely a majority of the votes cast on that particular question. (3) Where, at a general election a proposition is submitted to the voters, the result of the vote on the proposition will be determined by the votes cast for and against it, in the absence of a provision in the law, under which it is submitted, to the contrary. (4) Where a legislative body provides that a proposition shall be submitted to the voters, that those in favor of the proposition shall cast an affirmative vote, and that those electors opposed to the proposition shall cast a negative vote, and that a 'majority of the votes given' shall be requisite to the adoption of the proposed measure, then the only votes to be counted and considered in determining whether the measure is adopted or not are those which are given on the particular question involved." The court further said: "From an examination of the authorities bearing upon the question, we deduce the following rule: If, from the language of the statute, it is intended that a special vote shall be cast upon a proposition, and the law does not expressly require the majority of the votes cast at the general or regular election to adopt the measure, then it matters not whether the votes are cast at the same poll as is used for the election of officers. All that is necessary, in such case, is that the measure should receive a majority of the votes cast for or against it, and they can be separated from the rest of

the votes cast at such election and the result declared from the votes cast on the proposition."

McCrary on Elections.(4th ed.), §208, states the rule as follows: "Where a statute requires a question to be decided or an officer to be chosen by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast, provided always that there is a fair election and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. The 'voters of the county' referred to by all such statutes are necessarily the voters who vote at the election, since the result in each case must be determined by a count of the ballots cast and not by an inquiry as to the number not cast. This doctrine is well settled by the authorities."

Section 1 of article 14 of the constitution of Minnesota relating to proposed amendments thereto provides: "If it shall appear in a manner to be provided by law, that a majority of the voters present and voting shall have ratified such alterations or amendments, the same shall be valid to all intents and purposes, as a part of this constitution." In the case of *Dayton* v. *City of St. Paul,* 22 Minn. 400, it appears that a proposed amendment had been submitted under the above provision to the voters of that state at a general state election held for governor and other officials. The question presented in that appeal was as to whether, under the said provision of the constitution, a majority of the votes cast for and against an amendment would suffice to secure its adoption, or, in the event it was submitted at a general election, when a vote was to be taken for the election of state officers or the adoption of other propositions,

must it receive a majority equal to that of all of the votes cast at such general election for state officers or other propositions? It appears in that case that 26,636 votes were cast in favor of the ratification of the amendment involved, and 2,560 votes against it. The aggregate vote cast at the same election for governor was more than double the entire vote cast for and against the amendment, and while the latter received a majority of the votes cast for and against its ratification, still it did not receive a majority of all the votes cast at said election for governor. The court held, however, that the amendment had been ratified in accordance with the provisions of the constitution. In the course of the opinion, the court speaking through its chief justice said: "The precise meaning of the words, 'that a majority of the voters present and voting shall have ratified such alterations or amendments,' is not very clear. The doubt is as to what is intended by the words, 'voters present and voting.' Do they mean the voters present and voting upon the proposed amendment, or do they mean, in case the amendment shall be submitted (as the legislature may submit it) at an election for other purposes, the voters who may be present and take part in the election for such other purposes? We are of opinion that the words refer to the voters who are present and vote upon the proposition submitted to the electors, without respect to those who may be present and vote for other purposes at any election which may be held at the same time and place at which the proposition may, for reasons of convenience or other reasons, be submitted; and that those who may, at such time and place, come and vote for other purposes only are not to be regarded as present and voting, so far as respects the proposed amendment. It is the general rule, in affairs of government, that an election, or a voting, whenever called for, is to be determined by the votes of those who vote to fill the office which is to be filled, or for or against the proposition which is to be adopted or rejected, and not by counting, on either side, those who do

not vote at all. To take a case out of this general rule requires a clearly manifested intention to apply a different one."

The constitution of the state of Idaho in relation to proposed amendments requires that they shall be submitted "to the electors of the state at the next general election, and, if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this constitution. If two or more amendments are proposed, they shall be submitted in such manner that the electors shall vote for or against each of them separately." In *Green* v. *State Board, etc.* (Idaho), 47 Pac. 259, an amendment to extend the right of suffrage to women was submitted for ratification at a general election. It received 12,126 votes in favor of its ratification, while 6,282 were adverse. It further appears that there were some 10,000 or more electors who voted for state officers at said election who did not vote upon the said amendment. In construing the provision of the constitution quoted, the supreme court of Idaho held that a majority of the electors who voted for and against the adoption of the amendment was sufficient, within the meaning of that provision, to secure the ratification of the amendment, although the same was not a majority of the electors who voted at said election for state officials. In that case it is said: "Experience has shown that it is almost, if not quite, an impossibility to secure an expression from every elector upon any question, and, above all, upon a question of an amendment of the constitution; and it is equally difficult to ascertain the actual number of electors at any given time. * * * While it is true that some 10,000 or more electors would seem to have been entirely indifferent upon the question of the adoption of this and the other amendments, still all were—must have been—fully advised as to the importance of the questions submitted, and should their indifference be taken as conclusive of their opposition to the amendments? Upon what rule of honesty or righteousness

*In re* Denny.

can this be claimed? Is it not more reasonable, as well as more righteous, to say that in a matter about which they manifest such indifference their silence shall be taken as assent? We hold that the amendment under discussion is adopted, and has become a part of the constitution of the state of Idaho." Chief Justice Morgan in a concurring opinion after reviewing many authorities said: "Here, then, are a number of decisions which declare that, when a constitution or statute declares that a proposition requires a majority or two-thirds of all the voters of a given locality, such provision is satisfied if the proposition receives a majority or two-thirds, as the case may be, of all those voting, taking no count whatever of those, be the number large or small, who fail to vote. It is admitted that if a special election was authorized and held on this question, and it appeared that 3,000 votes or a less number were cast for the proposition, and 1,500 against it, it would be legally adopted. This is a distinction without a difference, as in this case the amendment is voted on separately, precisely the same as it would be if no other question was presented, or no officers were to be elected, and the vote taken and reported to the canvassers separately in the same way it would have been had this been the only question before the electors for their decision."

An act of congress approved February 22, 1899, known as the "Enabling Act" under which North and South Dakota, Montana, and Washington became states, directed the people in the territory of what is now the state of North Dakota to elect delegates to a convention to formulate a constitution to be submitted to the qualified electors for their adoption, and provided for the submission at the same time of separate articles or ordinances and required the adoption of the latter by a "majority of the legal votes cast." Article twenty of the proposed constitution, relating to prohibition of intoxicating liquors, was separately submitted. At the same election state officers were elected, and the ar-

ticle in question, it appears, received a majority of all the
votes cast for and against it, and also a majority of the votes
cast for and against the ratification of the state's constitu-
tion submitted at the same election, yet it did not receive
a majority of the votes cast for governor at that election.
Under these facts, the supreme court of North Dakota in
the case of *State* v. *Barnes,* 3 N. Dak. 319, 55 N. W. 883,
held that the article of the constitution in controversy had
been legally adopted. It was urged by counsel in that ap-
peal that a "majority of the votes cast" within the meaning
of the act of Congress in question was not in favor of the
adoption of said article. We quote the following from the
court's opinion: "Where, in this section, congress spoke
of the votes cast, it had reference to votes cast upon the par-
ticular objects which it directed should be submitted to a
vote of the qualified electors. Congress had no knowledge
that any candidates for offices would be voted for at that
same election, and the matter of electing officers was left
under the exclusive control of the constitutional convention;
and, further, it was the vote upon the constitution and the
articles, if any, separately submitted, that was to be certi-
fied to the president; and, if by the use of the words 'ma-
jority of legal votes cast' congress meant votes cast upon
any subject other than those directed to be certified to the
president, it would be obviously impossible for that official
ever to determine whether or not the constitution had been
legally adopted, and yet, under the act, the duty devolved
upon him to determine that question at once. These con-
siderations seem to us to conclusively establish that when
congress used the words 'majority of legal votes cast' it
meant votes cast for or against the adoption of the consti-
tution or of the articles separately submitted."

Article 6, section 1, of the constitution of Wisconsin,
after declaring who are qualified electors of that state, con-
tains the following proviso: "Provided, that the legisla-
ture may at any time, extend by law the right of suffrage to

persons not herein enumerated; but no such law shall be in force until the same shall have been submitted to a vote of the people, at a general election, and approved by a majority of all the votes cast at such election." In *Gillespie* v. *Palmer,* 20 Wis. 544, 572, the approval of an act of the legislature extending the right of suffrage under said proviso was involved. The act in question was submitted to the electors of that state for their approval at a general election, and received a majority of all the votes cast upon that question, but failed to receive a majority of all cast at the same election for state officers. The question presented to the court in that appeal for determination related to the meaning of the clause, *"approved by a majority of all the votes cast at such election."* (My italics.) It was insisted in that case, as it is in this, that the act in controversy was required to be approved by a majority of the votes cast upon all propositions and for all officers at such general election. This contention, however, the court denied, and held that the act of the legislature had been approved as required by the constitution, and in the course of the opinion it is said: "The candidates for governor at such election may not receive the votes of all the voters voting at such election, though they may receive more than the candidates for any other office. For there may be voters who, from want of confidence, or private pique, or ill will, will not vote for any of the candidates for governor, who will vote for the candidates for other offices; and there may be those who, for the same reasons, would not vote for the candidates for secretary of state, who would vote for the candidates for governor, state treasurer and other offices; and the same may be true in relation to the votes given for the candidates for the respective offices; so that all the candidates for any one office may not receive the votes of all the voters voting at such election by several hundreds and perhaps thousands. And yet the construction contended for requires that the extension of suffrage, to be carried, should receive a majority

of the votes of all the voters voting at such election for any and all candidates—should receive more votes than is required to elect a governor or any other officer, or to carry any other measure. Is it reasonable to suppose that this was the intention of the convention? Under the provisions of our constitution, as well as of other constitutions, persons are elected to a particular office who have a majority of the votes cast—not for the candidates for some other office, but for the candidates for that office. Measures or laws are also declared adopted or rejected according as they receive or fail to receive each a majority of the votes cast for or against it. * * * We do not see how any other construction can reasonably be given to the clause. The words added by this construction are words which, whenever the same or similar language is used in reference to a vote on any measure or for any office, are generally understood."

The constitution of New Jersey provides in respect to the submission of proposed amendments to a vote of the people as follows: "If the people at a special election to be held for that purpose only, shall approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments so approved and ratified shall become part of the constitution." At a special election held in 1897, proposed amendments to the constitution of that state were submitted and received 70,443 votes in their favor while 69,642 votes were adverse. It appears that 961 votes cast at this election were rejected upon various grounds. The question of their approval upon the part of the people at said election was presented to the supreme court and also to the court of errors and appeals of New Jersey in *Bott* v. *Secretary of State,* 62 N. J. L. 107, 40 Atl. 740; *Bott* v. *Wurts,* 63 N. J. L. 289, 43 Atl. 744, 881, 45 L. R. A. 251. It was contended that the amendments had not been adopted because they had not received "the vote of a majority of the electors qualified

to vote for members of the legislature voting thereon." The supreme court held the amendments adopted, that the ballots returned as rejected must be considered as properly rejected, and consequently must be excluded from the count and regarded as nullities. This judgment of the supreme court was brought for review before the court of errors and appeals by a writ of error and was there affirmed. The latter court on p. 300, 63 N. J. L., in denying the contention of the prosecutors of the writ, to the effect that a majority of all the votes as shown by the names on the poll lists, or at least a majority of all who cast ballots, whether the same were for or against any one of the amendments, or were rejected, was necessary to secure the adoption of the amendment involved, said: "By the words 'electors voting thereon' are intended the electors who exercise the right of suffrage in such manner that their votes should under the law be counted for or against the proposition submitted; and although the number of names on the poll lists may represent the number of qualified electors who attempted to vote, and the rejected ballots may all have been official ballots cast by some of these qualified electors, still it may be that not all of those qualified electors voted, in the constitutional sense, and that the rejected ballots were not votes. If, for example, an elector presented to the election officer and the officer deposited in the ballot-box two or more official ballots rolled or folded together, and in canvassing the votes the ballots were so found, those ballots would under the law be null and void, and the elector would not have voted on any of the amendments."

The cases, *pro* and *con*, to which I have referred upon the question in issue may be said to be, in the main at least, all in which constitutional amendments were involved. We are cited, however, in addition to decisions upon the adoption of constitutional amendments, to numerous other cases wherein constitutional or statutory provisions in regard to the submission to the voters of certain localities proposi-

tions of various character have been construed. These cases are both of service and force, for the reason, as said in Potter's Dwarris on Statutes, "There is a striking analogy and generally an entire harmony between the rules of interpretation of constitutions and those of statutes. An examination of these cases discloses that they fall within some one of the four classes enumerated in *City of South Bend* v. *Lewis,* 138 Ind. 512. The rule affirmed by this court in the latter case as we have seen in the first classification is to the effect that where a proposition is submitted to the electors of a district or state and its adoption is made to depend on the vote of the majority, those who do not vote are deemed as having acquiesced in the result reached by the votes cast thereon, although the latter may be a minority of those entitled to vote on the proposition. The following cases, among others, support this rule: *St. Joseph Tp.* v. *Rogers,* 16 Wall. 644, 21 L. Ed. 328; *County of Cass* v. *Johnston,* 95 U. S. 360, 24 L. Ed. 416; *Douglass* v. *County of Pike,* 101 U. S. 677, 25 L. Ed. 968; *Carroll County* v. *Smith,* 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 93; *Knox County* v. *Ninth Nat. Bank,* 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93; *Mobile Savings Bank* v. *Oktibbeha County,* 22 Fed. 580, 24 Fed. 110; *Madison County* v. *Priestley,* 42 Fed. 817; *Louisville, etc., R. Co.* v. *County Court,* 1 Sneed (Tenn.), 637, 62 Am. Dec. 452; *State* v. *Padgett,* 19 Fla. 518, 539; *Dunnovan* v. *Green,* 57 Ill. 63, 67; *People* v. *Town of Harp,* 67 Ill. 62; *Taylor* v. *McFadden,* 84 Iowa 262, 269, 50 N. W. 1070; *Citizens* v. *Williams,* 49 La. Ann. 422, 437, 21 South. 647, 37 L. R. A. 768; *Taylor* v. *Taylor,* 10 Minn. 107; *Reiger* v. *Town of Beaufort,* 70 N. C. 319; *Alley* v. *Denson,* 8 Tex. 297; *State* v. *Mayor of St. Joseph,* 37 Mo. 270; *State* v. *Binder,* 38 Mo. 450, 455; *Metcalf* v. *City of Seattle,* 1 Wash. St. 297; 25 Pac. 1010; *Yesler* v. *City of Seattle,* 1 Wash. St. 308, 25 Pac. 1014; *Sanford* v. *Prentice,* 28 Wis. 358.

The third classification in the South Bend case, to the

effect that when at a general election a proposition or measure is submitted its adoption or rejection will be determined by the votes cast thereon, in the absence of some constitutional or statutory provision to the contrary, is supported by the following cases in addition to those which·I have already reviewed: *Howland* v. *Board of Supervisors,* 109 Cal. 152, 41 Pac. 864; *Fiscal Court* v.·*Trimble* (Ky. 1898), 47 S. W. 773, 42 L. R. A. 738; *State* v. *Langlie,* 5 N. Dak. 594, 67 N. W. 958, 32 L. R. A. 723; *Board, etc.,* v. *Winkley,* 29 Kan. 36; *State* v. *Echols,* 41 Kan. 1, 20 Pac. 523.

The constitution of California forbids any county to incur any indebtedness to a certain extent "without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose." In the appeal of *Howland* v. *Board of Supervisors, supra,* a proposition had been submitted at a general election to the electors of a county in regard to incurring certain indebtedness. At said general election 6,500 votes were cast in the county, but only 3,880 of said voters voted in favor of incurring the indebtedness, while 1,006 voted against it. The court in the latter case held that two-thirds of the qualified electors of the county had by their votes assented thereto within the meaning of the constitution. The court in that appeal said: "If there had been no general election held at the same time this bond election was held, there would be no question but that two-thirds of the qualified electors of the county voting assented thereto, and the fact that the county, by its board of supervisors, embraced the privilege extended to it by the legislature, by the act of 1891, and held the election upon the day and at the same place as the general election, we think wholly immaterial. * * * The election was called by proclamation of the board of supervisors· of San Joaquin county, for a single, definite purpose, and *ex necessitate,* was a special election, and the votes cast for and against the issuance of bonds were all the votes cast at that election."

*In re* Denny.

The constitution of Kentucky prohibits under certain conditions the incurring of indebtédness upon the part of a county "without the assent of two-thirds of the voters thereof voting at an election to be held for that purpose." In the appeal of *Fiscal Court* v. *Trimble* (Ky.), 42 L. R. A. 738, it appears that there had been submitted to the voters of Montgomery county at the general November election of 1897 a proposition to issue certain bonds as obligations of that county. At said general election 1,920 votes were cast for the proposition, and 185 against it, and there were also cast at said general election in that county for state and county officers, in the aggregate, 3,060 votes. The court of appeals held that the proposition to issue the bonds in question had been assented to by the required two-thirds majority, although less than two-thirds of the electors who voted at the general election at which the measure had been submitted. In the course of the opinion it is said: "It is a fundamental principle in our system of government that its affairs are controlled by the consent of the governed, and, to that end, it is regarded as just and wise that a majority of those who are interested sufficiently to assemble at places provided by law for the purpose shall, by the expression of their opinion, direct the manner in which its affairs shall be conducted. When majorities are spoken of, it is meant a majority of those who feel an interest in the government, and who have opinions and wishes as to how it shall be conducted, and have the courage to express them. It has not been the policy of our government, in order to ascertain the wishes of the people, to count those who do not take sufficient interest in its affairs to vote upon questions submitted to them. It is a majority of those who are alive and active, and express their opinion, who direct the affairs of the government, not those who are silent, and express no opinion, in the manner provided by law, if they have any. Before reaching a conclusion that those who framed our fundamental law intended to change a well settled policy by

allowing the voter who is silent and expresses no opinion on a public question to be counted the same as the one who takes an interest in and votes upon it, we should be satisfied that the language used clearly indicates such a purpose.   *  *  *   The fact that the election was held for the purpose of obtaining the necessary assent of two-thirds of the voters to the proposition on the day of the general election to fill offices does not change the rule of interpretation, nor, if so required to be held, does it show a purpose to require the assent of two-thirds of those who vote for officers and on other questions at the election."

In the case of *Board, etc.,* v. *Winkley,* 29 Kan. 36, a law of that state providing for bounties to be given by counties to encourage the growing of hedges was involved.   The proposition to award such bounties was directed by the statute to be submitted to the people of the county at an election to be held at the same time provided for holding general elections for the election of county officers.   It was provided "If a majority of the voters are for the bounty" then the law was to be in full force and effect.   I quote from the opinion in that case:   "Within the terms of the statute, we think the bounty proposition is to be declared adopted or rejected, according as it receives or fails to receive a majority of the votes cast for or against it.   The votes cast for the township officers at the election of April, 1873, are not to be considered upon the bounty proposition.   The electors of Marion county were invited by the proclamation of the county commissioners to vote for or against the bounty.   A majority of the votes cast upon that particular proposition were for the bounty.   This result having been obtained, it was the duty of the county commissioners of the county to declare the act to encourage the growing of hedges to be in full force and effect in that county.   The electors who were present at the polls at the called election, and, while voting for township officers, did not vote upon

the bounty proposition, are presumed to assent to the expressed will of the majority of those voting thereon.". (Citing authorities.)

The constitution of Missouri forbids the legislature from authorizing "Any county, city, or town to become a stockholder in or loan its credit to any company, etc., unless two-thirds of the qualified electors of such county, city, or town at a regular or special election to be held therein shall assent thereto." Under an act of the legislature of that state, known as the "Township Aid Act," a certain township of Cass county voted by a two-thirds vote to issue township bonds to a railroad company, which were accordingly issued. In an action against Cass county as trustee of the township to recover interest overdue upon one of the bonds the question was raised that, although more than two-thirds voted at the election, two-thirds of the qualified voters of the township did not vote in favor of issuing the bonds. The case ultimately reached the Supreme Court of the United States. *County of Cass* v. *Johnston*, 95 U. S. 360. That court, after citing and reviewing many authorities relating to the general subject, announced its conclusion as follows: "This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed."

A statute of the state of Maryland authorizing the sale of spiritous liquors provided that on the day of the regular or general election in 1886 the voters of Washington county of that state "shall determine by ballot whether or not the provisions of this act shall go into effect in said county. Those favoring the act will cast their ballots with the words

*In re* Denny.

printed or written thereon, 'For the high license law', and those opposing the act will cast their ballots with the words printed or written thereon, 'Against the high license law' ". The act also provided that "If a majority of the voters of said county shall determine by their ballots in favor of the high license law and the clerk of said county shall so proclamate to the people of said county, the provisions of this act shall take effect." At the general election on the day fixed, the aggregate number of votes cast for the several candidates for congress in said county was 8,680. The number of votes cast in favor of the high license was 4,314, and against it 3,825. In the appeal of *Walker* v. *Oswald,* 68 Md. 146, 11 Atl. 711, the supreme court in holding that the license act had been ratified and was in full force and effect said : "It thus appears, and in fact it is conceded, that the number of votes cast in favor of the high license law was not equal to a majority of all the votes cast at the same election for the several candidates for congress ; though the votes actually cast in favor of this law constituted a majority of all the votes polled on that particular subject. The single question, therefore, presented by this appeal is, whether, under these circumstances, the act became operative and effective ; or, stated in other words, did the adoption of the act depend upon its receiving in its favor a majority of all the votes cast at that election upon some other subject or subjects ; or upon its receiving a majority of the votes cast specifically for and against its adoption ? It has been settled, both in England and in this country, by an almost, if not quite, unbroken current of judicial decisions from the time of Lord Mansfield to the present day, that when an election is held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves and those who being present abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting ; even though, in point of fact, but a minority of those entitled to vote really do vote. * * *

Conceding this to be true with respect to a special election held for the purpose of submitting a single question to the popular vote, it is insisted on the part of the appellant, that a different principle should prevail in a case like this where, at a general election, the measure, though receiving a majority of the votes cast on that subject, failed to receive a majority of the votes cast upon some other subject. Hence, as we have already stated, the sole ground upon which it is claimed that the act in question failed to become effective is, that at the general election when the subject was voted on, less than a majority of those who voted for the congressional candidates cast their ballots 'for the high license law;' and not that a majority of those who voted on this subject did not vote in favor of it. This objection to the adoption of the act is founded exclusively upon the construction which is sought to be placed upon the words of the eighth section—'a majority of the voters of said county' —taken in connection with the evidence furnished by the vote on the congressional canvass, that there were more votes in the county than the number who voted upon this measure. If this construction which confines the language to what is alleged to be its literal import, without reference to the provisions of the preceding section, is to prevail, it would be, it seems to us, as applicable in the case of a special election where but one subject is submitted, as it is claimed that it is in the case of a general election, where several subjects or persons are to be voted for—the only difference between the two instances being in respect to the evidence which might be adduced to ascertain the actual number of the voters of the county. In regard to a general election it is urged that the highest aggregate vote cast furnishes the evidence as to the number of the voters of the county. At a special election it is not improbable that only a minority of the voters, well known to be an unmistakable minority, may vote. This fact might be susceptible of proof—might be in reality self-evident. Yet in the latter

*In re* Denny.

instance those who absent themselves from the polls, and those who being present abstain from voting, are regarded as assenting to the result declared by those who do vote. Upon what principle would it be incompetent to apply the same presumption to those, who, though attending a general election and voting on other subjects, abstain from voting upon one particular matter like the act in question? The very concession that a minority may elect necessarily implies that there is a larger number of voters who do not vote, of whom that minority is merely a fraction."

In the case of *Smith* v. *Proctor,* 130 N. Y. 319, 29 N. E. 312, 14 L. R. A. 403, the question arose under a statute in respect to the issuing of bonds by a school district when authorized by "a majority of all the inhabitants of any school district entitled to vote", to be ascertained by the ayes and noes of "such inhabitants attending at any annual, special or adjourned school district meeting." At an adjourned meeting of the inhabitants of the district in question 115 entitled to vote were present. The resolution in dispute in that case received at this meeting for its adoption thirty-four votes, while thirty-three were cast against it, only sixty-seven of the 115 having voted upon the question. The insistence in that appeal was that the resolution had not received a majority of all the inhabitants entitled to vote who attended the meeting. The court, however, held that the resolution had been adopted pursuant to the provisions of the statute, and announced in its opinion that those who had not voted at all could not be considered as voting no on the proposition "because they did not vote no and so to record them would falsify the record."

In *May* v. *Bermel,* 20 N. Y. App. Div. 53, 46 N. Y. Supp. 622, the question arose upon the adoption of a proposition by the voters of the town of Newtown to issue certain bonds. The statute involved in that case provided that "a vote of the majority of the electors of any such town or towns voting at an annual town meeting or special town

meeting" must be first obtained to authorize such town or towns to borrow money. The proposition to borrow money was submitted to the electors at an annual town election or meeting held for the election of town officials, and it received a majority of all the votes of those who voted thereon, but did not receive a majority of all the electors who voted at said election for town officers. In holding that the proposition to issue the bonds was to be considered as a separate matter and the vote thereon as a separate election the court said: "If there had been a special town meeting called for this purpose, it could not be contended but that a majority of those who voted would control, even though a majority of the electors of the town did not attend or vote, or if a majority of the electors who attended such meeting did not vote upon the question, or that more blank ballots were cast than affirmative votes. If this would be true as to the special election, it is somewhat difficult to find a substantial reason why it would not be equally true of an annual town meeting. It is a fundamental proposition in our theory of government that the majority shall control, and the usual way in which such majority is evidenced is by giving all an opportunity to vote, and then counting such as vote affirmatively and such as vote negatively, the difference between the two constituting the majority. Those who fail to vote and those who cast blank ballots are not considered in determining the result, in the absence of some statutory authority which provides a different method, or commands the determination of a majority, based upon the whole number entitled to vote. Such was the rule at common law." The rule of the common law as declared by Lord Mansfield in *Oldknow* v. *Wainright,* 2 Burr. 1017, 1021, and by Lord Denman in *Gosling* v. *Velvey,* 7 Ad. & El. (N. S.) 406, 456, is to the effect that whenever electors are present and do not vote at all they virtually acquiesce in the election made by those who do. That a vote by a majority of a meeting means a majority of those who chose to

take part in the proceedings of such an assembly. This rule is universally affirmed in England and this country by many decisions of the higher courts, and is adhered to and affirmed by this court in the following cases: *Rushville Gas Co.* v. *City of Rushville,* 121 Ind. 206, 16 Am. St. 388, 6 L. R. A. 315; *State* v. *Dillon,* 125 Ind. 65; *Lamb* v. *Cain,* 129 Ind. 486, 14 L. R. A. 518; *State* v. *Vanosdal,* 131 Ind. 388, 15 L. R. A. 832; *City of South Bend* v. *Lewis,* 138 Ind. 512; *Pittsburgh, etc., R. Co.* v. *Harden,* 137 Ind. 486.

In this latter case, a township tax levied under the statute in aid of a railroad company was in issue. It is there said: "When a majority of those voting on the question have determined in favor of the burden, it is taken as the voice of the whole community; and not only those who do not or who can not vote upon the proposition, but even those who vote against it, are equally held bound by the result."

In the case of *Lamb* v. *Cain, supra,* the rule is forcibly asserted. The question presented in that appeal related to the amendment of the constitution of an ecclesiastical society. The constitution of the latter provided "there shall be no alteration of the foregoing constitution unless by request of two-thirds of the whole society." An amended constitution was submitted for approval to the votes of the organization, the membership of which at the time was 204,517. The total number of votes cast upon the various alterations proposed to be made in the constitution was 54,369, the same being far less than two-thirds of the members constituting said society. It was contended before this court in that case that the vote cast did not amount to a request to alter the constitution by two-thirds of the whole society as required. It was held in that appeal that the organic law could not be changed in any other mode than that prescribed by the instrument itself. Coffey, J., speaking for the court said: "The question is fairly presented

as to whether the vote in favor of the amended constitution is to be regarded as a compliance with the constitutional requirements relating to amendments, and this involves, to some extent, the legal mode of ascertaining the number of legal voters at a given election." After quoting with approval the section wherein the rule is asserted by McCrary in his work on elections to which I previously referred, the court concludes as follows: "But we are of the opinion that the number of votes cast at the election is to be considered, for the purposes of this case, as constituting the number of legal voters belonging to the church. Any other rule would be impracticable, and would lead to endless confusion and contention."

In the case of *Schlichter* v. *Keiter,* 156 Pa. St. 119, 27 Atl. 45, 22 L. R. A. 161, the same question arose in respect to the alteration or change in the constitution of an organization known as The Church of the United Brethren in Christ. The provision of the constitution of this church or society was substantially the same as the provision involved in *Lamb* v. *Cain,* 129 Ind. 486. The supreme court of Pennsylvania held that a majority of the whole number of persons voting was sufficient to adopt the new constitution therein involved. That it must be assumed that those who did not vote were either favorable or indifferent to the proposed change. The court said in the course of its opinion: "In all elections the non-voting must be counted as willing to be bound by the action of the majority of those who vote. Any other rule would lead to interminable trouble. * * * A majority consists of more than one-half of those who vote at a given election, not of those who might have voted, but did not vote." The same question virtually was before the supreme court of Illinois in *Kuns* v. *Robertson,* 154 Ill. 394, 40 N. E. 343, and the rule asserted in *Lamb* v. *Cain, supra,* and in *Schlichter* v. *Keiter, supra,* was approved and followed. There are many other cases cited of like import of those hereinbefore reviewed, but I do not deem it essential

further to extend this opinion by giving them special attention.

The contention, among others, of the Attorney-General is that the clause of the Constitution under consideration comes within both the third and fourth classification made by this court in *City of South Bend* v. *Lewis,* 138 Ind. 512, and hence, only a majority of the votes cast upon each separate amendment is necessary to secure its adoption. In *Bishop* v. *State,* 149 Ind. 223, 230, 63 Am. St. 279, 39 L. R. A. 278, it is said: "It is a rule generally asserted that words or terms used in a constitution which is dependent upon a ratification by the people must be interpreted in a sense most obvious to the common understanding at the time of its adoption, in the belief that such was the sense or meaning designed." The intention or meaning of the people who adopted our Constitution is to be sought in the instrument itself and the apparent meaning of words or language employed is to be taken as expressing such meaning except in cases where that assumption would lead to absurdity, ambiguity or contradiction. Black, Int. of Laws, p. 15.

Tested by the rule, what may be said to be the meaning of the clause immediately following the declaration that "It shall be the duty of the legislature to submit such amendment, or amendments, to the qualified electors of the State," namely, "if a majority of said electors shall ratify the same," can this clause be interpreted to mean a majority of those voting for and against a proposed amendment, or must it be considered as extending beyond this criterion and providing some other or different standard or mode for ascertaining what is "a majority of said electors"? As an aid in the search for the meaning or intent thereof I am referred to the debates of the convention which framed the Constitution. While these can have no controlling effect upon the interpretation of that instrument, still they may be said to be of importance where they tend to support a

construction which its own language or terms would indi-
cate.   An examination of the acts of the framers of our
fundamental law in convention assembled discloses that the
original article in relation to future amendments reported
by the committee to the convention and its adoption recom-
mended required that such proposed amendments be sub-
mitted to the people at the next general election, and further
provided "if a majority of all of the electors voting at said
election for members of the house of representatives shall
vote for such amendment or amendments, the same shall
become a part of the Constitution."   Mr. Owens subse-
quently presented a substitute for the article recommended
by the committee which with the exception of some verbal
changes made by the committee on phraseology is substan-
tially the same as §1 of article 16 of the Constitution as
finally adopted.   Debates of Constitutional Convention pp.
1914, 1918.  It will be seen that the substitute of Mr. Owens
differs from section two of the original article especially in
this, that it does not require amendments to be submitted
at the next general election nor neither does it require that
"a majority of all the electors voting at said election for
members of the house of representatives" shall be neces-
sary to their ratification.   It simply required "a majority
of said electors" to ratify the same.   When the matter came
up again in the convention for a third reading, Mr. Pettit
moved to recommit it with instructions to insert the fol-
lowing provision:   "No amendment shall be made to the
Constitution unless the same shall have been called for and
approved of by a majority of all the voters of the State".
A vote being taken on Mr. Pettit's motion it was lost
by a vote of twenty-seven to ninety-three, and the section
was thereupon passed by a vote of seventy-seven to forty-
five.   Debates of Constitutional Convention, p. 1940.
Thereafter the second section of article 16 was added
providing that the amendment or amendments should be
so submitted "that the electors shall vote for or against each

*In re* Denny.

of said amendments separately." An examination of these debates apparently discloses that it was the affirmative sense or meaning of the convention to fix or provide no particular time for an election at which proposed amendments should be submitted to the people. Neither does it appear that it was intended to fix or provide, aside from the usual and ordinary one, any particular method or criterion for ascertaining the majority of the electors voting at an election called in pursuance of an act of the legislature for the submission of proposed amendments. As indicated by the Constitution itself, as well as by the debates and action of those who framed it, it would certainly seem that the question both as to the time when the amendment or amendments were to be submitted, and likewise as to the standard or method by which the required majority should be tested, was, as previously asserted, left by the Constitution to the consideration of the legislature in submitting proposed amendments. In this view I am supported by the holding in *Bott* v. *Wurts*, 63 N. J. L. 289, 43 Atl. 744, 45 L. R. A. 251, heretofore considered, wherein on page 299 it is said: "The constitution being silent as to the mode of ascertaining the result of the voting and of determining whether the proposed amendments had been adopted, it was within the ordinary functions of the legislature to create a tribunal for those purposes and to clothe it with appropriate powers."

It is a fundamental principle under our government, as the authorities assert, which must have been understood by the framers and ratifiers of our Constitution, that a majority of those who exercise the right of suffrage shall control in its affairs. It must be further presumed that they also knew and understood that the usual and ordinary mode of ascertaining or evidencing such majority is by giving all legally entitled to vote on a proposition an opportunity to do so, and then counting such persons as choose to exercise the right of suffrage by casting an affirmative and negative vote

on the given proposition, the difference between the two votes constituting the majority essential to its adoption or approval. I may also indulge in the presumption that the men who framed the Constitution and the people who ratified their work must have understood that the great body of electors of the State is composed of a changing, uncertain, or indefinite number, which it is difficult at any given time actually to ascertain. They also presumably knew that there are thousands comprising that body who by reason of religious or conscientious views, or indifference, or from other reasons, decline when the opportunity is presented to exercise the right of suffrage. That while many do not vote at all others will vote only for some particular proposition or officer and will fail or decline to vote for others, and that therefore the most feasible and simplest method was the one universally recognized in the eye of the law long before the adoption of our Constitution, namely, give all entitled to vote an opportunity to exercise this privilege and then combine or aggregate the whole number of votes upon a given proposition or measure submitted to the electors of a district or locality; such combined vote to be taken or accepted upon any given proposition for all practicable purposes as comprising the whole number of the electors of the particular district or locality. This method of measuring the whole number is the one, as the authorities disclose, generally adopted, except where a different one is expressly prescribed. In such cases the non-voting must be counted as willing to be bound by the action of the majority who did vote upon the particular proposition, or, in other words, they may be considered as tacitly assenting to the result of those voting, and in this manner or by this method all of the electors of the district, or State, as the case may be, are taken into account.

Mr. Cushing in his Manual of Parliamentary Law in paragraphs 117 and 120, in speaking in relation to the law of elections, says: "The term majority, that is, the greater

number, is understood in this country in two significations. In its broadest sense, it denotes the greatest of any number of unequal divisions of the whole body; in its strictest, the greater of any. two unequal divisions of the whole body. In the popular elections of this country, both these principles are practically applied; the first being known as the principle of plurality; the other only as that of majority. In order to determine the result of an election, on the principle of an absolute majority, it is necessary in the first place, to ascertain the whole number of persons who have voted; which, if the suffrages are taken orally,  *. * * or if the voting is by ballot, by counting the number of ballots."

The method which I have indicated must in reason be the one which the Constitution contemplates shall be adopted or provided by the legislature in submitting proposed amendments for ratification, and the test by which the majority necessary for ratification shall be determined is to consider alone the majority of the combined or aggregate vote cast for and against the ratification of each amendment.    In this view I am supported by §2 of article 16 which requires that the amendment or amendments shall be submitted in such a manner that the electors shall vote for or against each amendment separately.    This provision would seem to be a positive command that the electors exercising the right to vote thereon shall vote for or against each of them separately and distinct from the others.    Why was this required if the whole number of the electors was not to be tested by the combined affirmative and negative vote cast separately on each amendment, but, as contended, must be ascertained by the highest number of votes cast at the same time upon some other proposition?    This method for determining the whole number of the electors of the State is virtually conceded in *State* v. *Swift,* 69 Ind. 505, on page 526 of the opinion, where it is said: "The opinion, therefore, of this court is, that it requires a majority of the electors of the

State to ratify an amendment to the Constitution, but that the whole number of votes cast at the election at which the amendment is submitted may be taken as the number of electors of the State." Or, in other words, the court fairly concedes that in the event the amendment is submitted at a special election, the whole number of votes cast thereon may be taken or accepted as comprising the entire number of the electors of the State. In my opinion there can be no sufficient reason advanced for asserting that those who molded and ratified the Constitution of this State intended by the provision in question to change the well settled policy or mode so universally recognized by allowing electors, who from indifference, or otherwise, decline to express any choice upon the ratification or rejection of an amendment to the Constitution, to be counted, the same as those who took an interest therein and evinced such interest by voting *pro* or *con* thereon. The Constitution surely does not contemplate that the silent, passive, or non-voting electors upon a proposed amendment shall be counted or considered in estimating the number of electors, or the majority essential to its ratification. Evidently the clause "a majority of said electors" was intended to mean such electors as saw proper to exercise the right of suffrage and actually cast their votes for or against a proposed amendment. It is insisted that the election at which the amendment was submitted was a general election and that it was submitted to the electors of the State to be voted upon at and as a part of said general November election, and hence the returns of the votes cast thereon cannot alone be accepted, but that the court must go beyond and look to the returns in respect to said general election, and thereby it is asserted that it will be shown that a majority voting at the general election for Governor or other candidates on the State ballot did not vote upon the proposition of ratifying or rejecting the amendment. It, however, can not be successfully asserted that the amendment was submitted to the people to be voted upon at and as

a part of the general election of 1900. It was submitted under a special act of the legislature enacted solely for that purpose, and the votes cast for and against it can not be said to have been cast at a general election. The proposition to ratify the amendment was neither upon the state nor local ballots used for voting at the general election, but was, as provided by the act of 1899, printed upon ballots which were separate and distinct from all other ballots used at said general election. To all intents and purposes the vote directed by the act of 1899 to be taken upon the adoption or rejection of the proposed amendments was under that law a special election, as much so as though the act had fixed the 7th day of November, 1900, the day following the general election, for a vote to be taken on their adoption or rejection and had further provided that it should be held at the same precincts and by the same election officers who held the general election on the previous day. Had the legislature intended that the amendment should be submitted at a general election, and as a part thereof, it would have provided that it be submitted under that section of our general election law in respect to constitutional amendments, which is as follows: "Whenever any constitutional amendment or other question is required by law to be submitted to popular vote, if all the electors of the State are entitled to vote on such question, the State Board of Election Commissioners shall cause a brief statement of the same to be printed on the state ballots, and the words 'yes' and 'no' under the same, so that the elector may indicate his preference by stamping [marking] at the place designated in front of either word. * * * In case any elector shall not indicate his preference by stamping [marking] in front of either word, the ballot as to such question shall be void and shall not be counted." §6258 Burns 1894. The act of 1899 under which the amendments were submitted among other things provided that they should be printed on ballots of white paper and should be designated

as "Amendment No. 1", and "Amendment No. 2", and on the ballot to the left of each separate amendment should be the words, "For the amendment", and underneath the words "Against the amendment", and directed that "the voter shall make a cross with a blue pencil in the square to the left of whichever set of words he desires to vote." One of these ballots as the act directed was to be delivered to each of the electors before entering the election booth in the manner now provided by law. The act further provides that the election shall be governed by the laws controlling elections "except as hereinafter provided". Section 2 after providing for the return to the Secretary of State of the total vote given for and against each amendment, etc., provides: "If it shall appear that a majority of all the votes cast at such election were given in favor of the adoption of either or both of said proposed constitutional amendments, the Governor shall make proclamation, and it or they shall then become part of the Constitution of the State of Indiana."

It must be assumed that the election officers faithfully discharged their duties in compliance with the statute under which the amendments were submitted, and also in compliance with the provisions of the general election law which were to govern the election in question so far as applicable. By the express provisions of the act, every elector present at the general election, upon entering the election room, and before entering the booth to prepare his ballots for voting, was supplied by the election officers with one of these official ballots for voting separately upon each amendment submitted. After indicating his choice upon the ballot, as the law directed, or after attempting to do so, or after declining to express any choice whatever, we may assume that upon leaving the booth each elector handed the ballot so furnished to him, whether properly marked or not, to the election inspector, who deposited the same in the proper ballot-box. For by the provisions of the general election law it is declared to be unlawful

for any voter to attempt to leave the election room with a ballot in his possession, and it is made the express duty of the election officers not to permit any voter to whom a ballot has been delivered to leave such room without either voting the ballot or returning the same to the poll-clerk.   It is apparent that under the law all the qualified electors of the State were called upon to vote for or against each one of the proposed amendments at the time designated for a vote to be taken thereon.   All who attended at the general election were afforded an opportunity to do so, by having the necessary ballot to be used for that purpose placed in their hands by the election officials.   If they did not under the circumstances avail themselves of the right to vote, or exercise a choice in the manner provided by law, it must be considered, when tested by the rule herein asserted, that those who did not express a choice upon the amendments, or expressed a choice only as to one and not as to the other amendment, must by their action be deemed to have affirmatively declined to do so, and in effect may be said to have thereby declared that they were willing to assent to the expressed will of the majority who voted upon each amendment.   Whatever the difference existing between the total vote cast for Governor at the general election and that cast upon either one of the amendments may be, or whatever the difference may be between the total vote cast upon amendment number one and amendment number two, in the absence of any evidence to the contrary, must be presumed to be due to or resulted from the fact that a number of the ballots upon the amendments, which were placed in the ballot-box by the inspector of the election, were rejected upon the count by the election board and not counted upon legal grounds.   It will be seen from an examination of that section of our general election law heretofore set out that it is declared therein that in case any elector "shall not indicate his preference by stamping [marking] in front of either

word, the ballot as to such question shall be void and shall not be counted." It may then be presumed, nothing to the contrary appearing, that what ballots were rejected by the various election boards throughout the State were, under the law, rightly rejected and not counted for legal cause, and hence can not be considered as votes for or against either amendment. Such ballots the statute declares in effect to be mere nullities, and they are not entitled to be taken into the count of the votes cast upon either amendment, and are virtually of no force, under the law, for any purpose in connection with the question herein involved. The statute of 1899, like the statute of 1873, which submitted to the electors the constitutional amendment in respect to the Wabash and Erie canal stock, required no other count or return than that of the aggregate vote cast on each amendment. The act in question provides in effect that if it shall appear that "a majority of all the votes cast at such election" upon either amendment was in its favor, it shall then become a part of the Constitution. That is the usual and ordinary test or criterion, as I have shown, and the one which the legislature had the power to provide, and that is the test or evidence of the ratification of the amendment by which this court in this case should be controlled. It appearing that the amendment in controversy having received a majority of all the votes cast for and against it at the time designated by the statute for a vote to be taken thereon, it was therefore duly ratified by the electors of the State, and has become a part of the Constitution of the State of Indiana.

The extreme views and conclusions announced in the prevailing opinion of the court, in respect to the interpretation to be placed upon the particular clause of the Constitution, are, in my opinion, not in harmony with its meaning, neither are they justified by the canons which control the construction of constitutional law. The decision is to be regretted, as it will materially hinder, or render it an ex-

tremely difficult matter in the future to make the needed changes in our fundamental law. The holding therein to the effect that although the amendments had each received a large majority of the votes cast thereon, still they must be considered as rejected, and hence cannot be resubmitted for the reason that they did not receive a majority of all the votes cast at the general election for Governor, is not warranted by the Constitution, and militates against sound reason. The decision in this respect goes beyond the holding in *State* v. *Swift*, 69 Ind. 505, as it was there held that the amendment involved was ineffectual for want of the constitutional majority, but that the legislature might resubmit it to the electors of the State. The Constitution does not limit the submission to any particular legislature, but simply declares that it shall be the duty of the General Assembly to submit, etc. The power is a continuing one in the legislature, and while it may be said that it is the duty of the legislature which has finally agreed to the amendment to submit it, still if not properly submitted, or if the people neither ratify nor expressly reject it by their votes cast thereon, it may be resubmitted. I conclude that the judgment ought to be affirmed.